815 A.2d 432

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. WILLIAM T. EVERS, DEFEN-DANT–RESPONDENT AND CROSS–APPELLANT.

Argued September 24, 2002—Decided February 13, 2003.

356

360

*Wendy Alice Way,* Deputy Attorney General, argued the cause for appellant and cross-respondent (*David Samson,* Attorney General of New Jersey, attorney).

*Paul J. Jackson* argued the cause for respondent and cross-appellant.

The opinion of the Court was delivered by

ALBIN, J.

Defendant William T. Evers challenges the validity of a search of his home authorized by a warrant that uncovered evidence of his possession and transmission of child pornography on the Internet and led to his conviction of multiple violations of the child endangerment statute, *N.J.S.A.* 2C:24–4. The State challenges defendant's sentence to a probationary term for second-degree child endangerment, an offense that carries a presumption of imprisonment, *N.J.S.A.* 2C:44–1d. We now resolve these claims.

## I.

By all appearances, defendant was the very model of middle-class decorum and success. He had been happily married for thirty years, lived in the same Nutley home for twenty-five years, and reared a daughter, adopted at birth, for eleven years. At age fifty, defendant had the satisfaction of steady employment and good health. He played a direct role in the upbringing of his daughter, participated in community activities, and had never been arrested in his life. All in all, he seemed an exemplary citizen. But there was another side to defendant, the side he kept hidden from public view, an obsession with surfing the Internet for adult and child pornography.

In 1997, defendant purchased his first personal computer, which he placed in the basement of his house. His wife, Elayne, opened an America Online (AOL) account with the charges billed to her credit card at their home in Nutley. Each family member used the computer, and each had separate AOL screen names and passwords.

Defendant assumed two AOL screen names, one reserved exclusively for interactions with adult and child pornography Internet sites, "BTE324," and the other for interactions with friends, family, and some additional adult pornography sites, "WTE324." In a familiar routine, defendant would visit adult pornography websites and chat rooms on his computer every morning. By downloading photographs onto the hard drive of the computer, defendant was able to assemble a pornographic library. More than a year after his first venture into on-line adult pornography, he began exploring "special interest" child pornography chat rooms on a daily basis and exchanging child pornography with other users. Over a period of approximately six weeks, defendant collected several hundred pornographic "pictures of kids" through the Internet. In April 1999, defendant suffered an attack of "conscience" and became concerned that he might be "caught" by law enforcement authorities, his wife, or his daughter, so he ceased his excursions to the child pornography chat rooms. His

fear of detection, however, did not deter him from maintaining on his computer hard drive scores of pornographic images of nude ten- to fifteen-year-old girls engaged in sexual activities. The day before his arrest, defendant was browsing through his library of child pornography.

In February 1999, Deputy Sheriff Michael A. DiMatteo of the San Bernardino County Sheriff's Department in California was investigating the use of child pornography on the Internet. He created a screen name—"Tightone4u"—and logged onto AOL, entering a chat room bearing a title strongly suggestive of sexual activity involving children—"NOxHAIRxYET." He submitted his screen name and e-mail address to a list-serve [1] employed by the chat room that allowed other AOL subscribers interested in this subject matter to communicate with him. On February 15, 1999, DiMatteo checked his e-mail account and discovered responses from ninety-eight different screen names from the chat room "NOxHAIRxYET." One response, containing images of a nude female child in a sexually provocative position, was from the user of screen name "BTE324," who had sent the same images to fifty other screen names as well.

With this information, DiMatteo applied to the Superior Court of San Bernardino County for a search warrant for the purpose of learning the identities of the users of the ninety-eight screen names trading in child pornography. He received the warrant and mailed it to AOL's corporate headquarters in Dulles, Virginia. Without challenging the manner of service or jurisdiction, AOL simply provided DiMatteo with the information demanded in the warrant, including the name of the account holder and the billing address of the screen name "BTE324."

---

[1] A list-serve is a computer program that creates an automatic mailing list of e-mail addresses. Any messages sent to those addresses are transmitted solely through e-mail and can only be viewed in the first instance by the intended recipient.

After learning that the billing account for screen name "BTE324" was Elayne Evers of Nutley, New Jersey, DiMatteo forwarded the results of his investigation to the Nutley Police Department. Armed with that information, Nutley Police Detective Sergeant Daniel Meehan applied for a warrant to search the Evers' residence for "any and all computers, computer programs, hard and soft drives, disks, or diskettes, or any computer related equipment, plus any and all information which may lead to the identity of the individuals using the screen name BTE324."

A Superior Court judge reviewed Meehan's affidavit and found probable cause to issue the warrant. On May 25, 1999, the Nutley police searched the Evers' residence, seizing the hard drive of the family computer. Defendant, who was home at the time, was arrested and made a full confession concerning his use of the computer to acquire and trade in child pornography.

Defendant was initially indicted on one count of second-degree endangering the welfare of a child by distributing "a photograph through the Internet, which depicted a child engaged in a prohibited sexual act," *N.J.S.A.* 2C:24–4b(4)(a) (current version at *N.J.S.A.* 2C:24–4b(5)(a)), and on one count of fourth-degree endangering by knowingly possessing and/or viewing that photograph on his personal computer, *N.J.S.A.* 2C:24–4b(4)(b) (current version at *N.J.S.A.* 2C:24–4b(5)(b)). After he refused a plea offer from the State, investigators "cracked" the hard drive of defendant's computer and retrieved over forty images which defendant conceded depicted child pornography. The photographs generally depict naked girls under the age of sixteen engaged in various sexual acts with adults.

The State then obtained a superseding indictment charging defendant with the same single count of second-degree distribution and forty-three counts of fourth-degree possession of child pornography. Defendant pled not guilty to those charges and sought admission into the Essex County Pretrial Intervention Program (PTI). The trial court affirmed the prosecutor's denial of defendant's PTI request and denied defendant's motion to

suppress his confession and the evidence seized pursuant to the New Jersey search warrant. Defendant then entered a conditional guilty plea to one count of distribution of child pornography and to forty counts of possession of child pornography. The court agreed to consider downgrading the distribution charge by one degree and imposing concurrent sentences on the distribution and possession charges.

At sentencing, the court downgraded the second-degree distribution offense to the third-degree sentencing range, *N.J.S.A.* 2C:44–1f(2), and concluded that a sentence of imprisonment would constitute a "serious injustice," *N.J.S.A.* 2C:44–1d. The court then sentenced defendant to five years' probation conditioned on 364 days of incarceration in the Essex County jail. The court suspended the county jail custodial term pending its six-month review of defendant's case and ordered that defendant receive outpatient counseling and treatment at the Avenel Adult Diagnostic and Treatment Center (Avenel). Defendant was also ordered to comply with the annual registration and address verification requirements of Megan's Law, *N.J.S.A.* 2C:7–2; *N.J.S.A.* 43–6.4. The sentences imposed on the forty child pornography possession charges were made to run concurrent with one another and with the distribution charge. The three remaining possession counts were dismissed on the State's motion.

The State appealed the probationary sentence imposed on the second-degree distribution charge, *N.J.S.A.* 2C:44–1f(2), and defendant appealed, among other things, the denial of his motion to suppress evidence seized in the search of his home. In an unpublished opinion, the Appellate Division panel affirmed the convictions and sentences in all respects. In a dissent limited to the sentencing issue, Judge Steinberg concluded that the presumption of imprisonment on the charge of second-degree distribution of child pornography had not been overcome and that the trial court had abused its discretion by imposing a term of probation.

Our consideration of the State's appeal as of right, based on the dissent below, is limited to the propriety of defendant's probationary sentence for second-degree distribution of child pornography. *R.* 2:2-1(a)(2); *R.* 2:12-3(b); *R.* 2:12-11. The State has not sought review of, and we shall not disturb, the trial court's determination to downgrade the second-degree offense for sentencing purposes. We granted defendant's petition for certification, limited to the issues arising out of defendant's claim that the evidence seized pursuant to the New Jersey search warrant should be suppressed. *R.* 2:12-11; *State v. W.T.E.*, 172 *N.J.* 179, 796 *A.*2d 895 (2002).

## II.

In challenging the validity of the warrant issued for the search of his home, defendant raises two issues. First, defendant claims that the affidavit in support of the New Jersey search warrant contained information acquired by San Bernardino County Deputy Sheriff DiMatteo in violation of his reasonable expectations of privacy, as well as California and Virginia law, thereby tainting the affidavit and making fatally defective the warrant. Second, he claims that the search of his home was authorized by a warrant that did not meet the probable cause standard. The resolution of those issues must be found in the text and interpretation of the Fourth Amendment to the United States Constitution and its state analogue, Article I, Paragraph 7 of the New Jersey Constitution.

## A.

 Defendant claims that he had a reasonable expectation of privacy with respect to the pornographic material he unloosed into the electronic stream of commerce when he e-mailed two photographs of an under-aged nude girl in an exposed position to fifty-one chat-room subscribers. To invoke the protections of the Fourth Amendment[2] and its New Jersey counterpart, Article I,

---

[2] The Fourth Amendment to the United States Constitution provides:

Paragraph 7,[3] defendant must show that a reasonable or legitimate expectation of privacy was trammeled by government authorities. *Smith v. Maryland*, 442 *U.S.* 735, 740, 99 *S.Ct.* 2577, 2580, 61 *L. Ed.*2d 220, 226 (1979); *State v. Marshall*, 123 *N.J.* 1, 66, 586 *A.*2d 85 (1991), *cert. denied*, 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). To meet this test, he must establish that he had both "an actual (subjective) expectation of privacy," and "one that society is prepared to recognize as reasonable." *Katz v. United States*, 389 *U.S.* 347, 361, 88 *S.Ct.* 507, 516, 19 *L.Ed.*2d 576, 588 (1967) (Harlan, J., concurring); *Marshall, supra*, 123 *N.J.* at 66–67, 586 *A.*2d 85. It has long been accepted that "[w]hat a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection." *Katz, supra*, 389 *U.S.* at 351, 88 *S.Ct.* at 511, 19 *L. Ed.*2d at 582 (citations omitted); *Marshall, supra*, 123 *N.J.* at 67, 586 *A.*2d 85. An individual ordinarily surrenders a reasonable expectation of privacy to information revealed to a third-party. If that third-party discloses the information to the government, the individual, who falsely believed his confidence would be maintained, will generally have no Fourth Amendment claim. *United States v. Miller*, 425 *U.S.* 435, 443, 96 *S.Ct.* 1619, 1624, 48 *L.Ed.*2d 71, 79 (1976). *See also Guest v. Leis*, 255 *F.*3d 325, 335 (6th Cir.2001).

---

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
[*U.S. Const.* amend. IV.]

[3] Article I, Paragraph 7 of our State Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers or things to be seized.
[*N.J. Const.* art. I, ¶ 7.]

■ Applying these principles, defendant clearly had no reasonable expectation of privacy in the content of e-mail he forwarded to fifty-one intended recipients, one of whom happened to be an undercover police officer. Defendant transmitted the forbidden e-mail at peril that one of the recipients would disclose his wrongdoing. There is no constitutional protection for misplaced confidence or bad judgment when committing a crime. Nor can defendant find refuge in the New Jersey Wiretapping and Electronic Surveillance Control Act, *N.J.S.A.* 2A:156A–1 to –34. The Wiretapping Act does not give defendant a protected privacy interest in the child pornography e-mail communication he forwarded to a California law enforcement officer who, in turn, disclosed the illicit content of that communication. *See, e.g., N.J.S.A.* 2A:156A–4(b) (explicitly excluding interception of electronic communication by law enforcement officer, who "is a party to the communication," from Act's purview). *See also* 18 *U.S.C.A.* § 2511(2)(c) (providing that "[i]t shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception"); 18 *U.S.C.A.* § 2511(2)(d) (excluding person, who is party to communication, from prohibitions of Federal Wiretap Act as amended by Electronic Communications Privacy Act of 1986).

■ We next examine whether defendant possessed an objectively reasonable expectation of privacy under our Federal or State Constitutions in the subscriber information stored at AOL headquarters in Virginia. Although defendant's wife was the named AOL account holder for the Evers family, we will assume that defendant has a privacy interest sufficient to invoke standing to challenge the constitutionality of the use of the subscriber information to procure a New Jersey warrant. *State v. Alston,* 88 *N.J.* 211, 228–29, 440 *A.*2d 1311 (1981). *See also State v. Curry,* 109 *N.J.* 1, 7–9, 532 *A.*2d 721 (1987).

The California search warrant served by mail on AOL headquarters in Dulles, Virginia, sought account information concerning screen name "BTE324" and yielded the name, address, and telephone number of Elayne Evers, other screen names associated with the account, the method of accessing the Internet, and additional basic account information. This account information did not contain a record of when each screen name logged on or off the Internet or the content of any e-mail communication.

At the time he received the pornographic e-mail, Deputy Sheriff DiMatteo had no way of knowing that the holder of screen name "BTE324" was a New Jersey resident. New Jersey law enforcement authorities did not assist DiMatteo in any way in procuring the warrant from the California magistrate. DiMatteo did not have any contact with the Nutley Police Department until after AOL, in response to the California warrant, forwarded to him the account information revealing the billing account holder for screen name "BTE324."

No purpose would be served by applying New Jersey's constitutional standards to people and places over which the sovereign power of the state has no power or control. *See State v. Mollica*, 114 *N.J.* 329, 347, 554 *A.2d* 1315 (1989) (holding "protections afforded by the constitution of a sovereign entity control the actions only of the agents of that sovereign entity"). Article I, Paragraph 7 of our State Constitution protects the rights of people within New Jersey from unreasonable searches and seizures by state officials, and its jurisdictional power extends to agents of the state who act beyond the state's borders in procuring evidence for criminal prosecutions in our courts. Our State Constitution has no ability to influence the behavior of a California law enforcement officer who does not even know that New Jersey has an interest in a matter he is investigating. Therefore, we decline to hold that defendant had a right of privacy protected by Article I, Paragraph 7 in the subscriber information at AOL headquarters in Virginia.

We now proceed with analysis under the Fourth Amendment. In *Smith, supra,* the United States Supreme Court held that a

defendant did not have a legitimate expectation of privacy in the phone numbers he dialed that were revealed through a pen register (as opposed to the contents of the telephone calls) and, therefore, could not invoke the protection of the Fourth Amendment. 442 *U.S.* at 743–44, 99 *S.Ct.* at 2582, 61 *L.Ed.*2d at 228–29. Other federal courts, likewise, have held that there is no protected Fourth Amendment privacy interest in subscriber information given to an Internet service provider. *Guest, supra,* 255 *F.*3d at 336 (noting that "computer users do not have a legitimate expectation of privacy in their subscriber information because they have conveyed it to another person—the system operator"); *United States v. Kennedy,* 81 *F.Supp.*2d 1103, 1110 (D.Kan.2000) ("When defendant entered into an agreement with Road Runner for Internet service, he knowingly revealed all information connected to the [Internet protocol] address 24.94.200.54. He cannot now claim to have a Fourth Amendment privacy interest in his subscriber information.").

■ Defendant contends that the Federal Electronic Communications Privacy Act of 1986 (ECPA), 18 *U.S.C.A.* §§ 2701–2712, which provides the means by which a government entity may acquire subscriber information from an Internet service provider, creates an objectively reasonable expectation of privacy recognized by the Fourth Amendment. The ECPA requires a government entity seeking to procure subscriber information from an Internet service provider to do so by warrant, court order, subpoena, or consent of the subscriber. 18 *U.S.C.A.* § 2703(c)(1).[4] Al-

---

4 Title 18, section 2703 of the United States Code provides, in relevant part:

 (c) Records concerning electronic communication service or remote computing service.—

 (1) *A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity—*

 (A) *obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant ;*

though 18 *U.S.C.A.* § 2703 provides statutory privacy rights for Internet service provider subscribers, it does not afford an objectively reasonable expectation of privacy under the Fourth Amendment.

In *United States v. Hambrick,* a New Hampshire police officer served a New Hampshire state subpoena on the defendant's Internet service provider, MindSpring, in Atlanta, Georgia for defendant's subscriber information. 55 *F.Supp.*2d 504, 505 (W.D.Va.1999), *aff'd* 225 *F.*3d 656 (4th Cir.2000), *cert. denied,* 531 *U.S.* 1099, 121 *S.Ct.* 832, 148 *L.Ed.*2d 714 (2001). The subpoena was signed by a New Hampshire Justice of the Peace, who was also a member of the local police department, and the government conceded the invalidity of the subpoena. *Id.* at 506. Through the invalid subpoena, subscriber information was procured and later used to secure a warrant to search the defendant's home. In moving to suppress evidence gained from the search of the home, the defendant challenged the information acquired from the invalid subpoena served on MindSpring, which was used as the basis for obtaining the search warrant. *Ibid.* The district court held:

---

(B) *obtains a court order for such disclosure under subsection (d) of this section;*
(C) has the consent of the subscriber or customer to such disclosure; or
. . . .
(E) seeks information under paragraph (2).
(2) A provider of electronic communication service or remote computing service shall disclose to a governmental entity the—
(A) name;
(B) address;
(C) local and long distance telephone connection records, or records of session times and durations;
(D) length of service (including start date) and types of service utilized;
(E) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and
(F) means and source of payment for such service (including any credit card or bank account number), of a subscriber to or customer of such service when the governmental entity uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena or any means available under paragraph (1).
[18 *U.S.C.A.* § 2703(c)(1)(A)-(C), (c)(1)(E), (c)(2)(A)-(F) (emphasis added).]

> Although Congress is willing to recognize that individuals have some degree of privacy in the stored data and transactional records that their [Internet service providers] retain, the ECPA is hardly a legislative determination that this expectation of privacy is one that rises to the level of "reasonably objective" for Fourth Amendment purposes. Despite its concern for privacy, Congress did not provide for suppression where a party obtains stored data or transactional records in violation of the Act.... For Fourth Amendment purposes, this court does not find that the ECPA has legislatively determined that an individual has a reasonable expectation of privacy in his name, address, social security number, credit card number, and proof of Internet connection. The fact that the ECPA does not proscribe turning over such information to private entities buttresses the conclusion that the ECPA does not create a reasonable expectation of privacy in that information.
>
> [*Id.* at 507.]

The defendant had no reasonable expectation of privacy in the subscriber information. The district court decided the issue as though MindSpring had disclosed the information to the government without requiring a subpoena. In that circumstance, the defendant could sue MindSpring for the unwarranted disclosure, but not insist on suppression of the evidence in a criminal prosecution. *Id.* at 509. *See also Kennedy, supra,* 81 *F.Supp.*2d at 1110 (holding that defendant had "not demonstrated an objectively reasonable expectation of privacy in his subscriber information" despite his reliance on ECPA).

Accordingly, we hold that defendant had no Fourth Amendment or Article I, Paragraph 7 protected privacy right in the subscriber information provided to AOL.

## B.

■ Having decided that defendant possessed no constitutionally protected privacy right in the subscriber information at AOL headquarters in Virginia, the question remains whether a violation of a federal statute or sister-state law, even if proved, is a sufficient ground for New Jersey to apply its exclusionary rule. Defendant argues that the warrant was unenforceable in Virginia because the power of California law ends at its state line and, therefore, the subscriber information delivered by AOL to DiMatteo was in violation of the ECPA and California law and would not

have been admissible in a California court. Defendant does not contest that the warrant served on AOL was issued by a California magistrate upon a finding of probable cause and comported with the basic warrant requirements of the Federal Constitution. Nevertheless, he claims that the subscriber information was unlawfully acquired and should not have been used as a basis for the issuance of a warrant to search a home in New Jersey.

We begin by noting that we are not persuaded that the subscriber information that DiMatteo obtained from AOL would not have been admissible in a California court. DiMatteo obtained a search warrant from a neutral and detached California magistrate, "a court with jurisdiction over the offense." 18 *U.S.C.A.* § 2703(c)(1)(A). AOL chose to comply with the warrant despite the questionable jurisdictional authority of a California warrant over a company headquartered in Virginia. It is not at all clear that the California warrant, even though unenforceable in another jurisdiction such as Virginia, did not meet the standards of the ECPA. To the extent Congress intended the ECPA to require judicial scrutiny before the issuance of a warrant, that objective was met. Moreover, even if there was a violation of the ECPA, exclusion of evidence is not provided as a remedy. *Kennedy, supra,* 81 *F.Supp.*2d at 1110 (holding "that even if Road Runner divulged defendant's subscriber information pursuant to a court order based on an inadequate government application, suppression is not a remedy contemplated under the ECPA"); *Hambrick, supra,* 55 *F.Supp.*2d at 507. Accordingly, we remain unconvinced that the subscriber information would have been inadmissible under California law. *See People v. Hines,* 15 *Cal.*4th 997, 64 *Cal.Rptr.*2d 594, 938 *P.*2d 388, 420 (1997) (holding that pursuant to amendment of California Constitution, "relevant evidence that is illegally obtained under California law is nonetheless admissible, so long as federal law does not bar its admission"), *cert. denied,* 522 *U.S.* 1077, 118 *S.Ct.* 855, 139 *L.Ed.*2d 755 (1998). *See also Cal. Const.* art. I, § 28(d) (mandating that except as provided by state statute, "relevant evidence shall not be excluded in any criminal proceeding"); *Miranda v. Superior Court,* 13 *Cal.App.*4th 1628, 16

*Cal.Rptr.*2d 858, 860–62 (1993) (applying "good faith" exception to exclusionary rule as stated in *United States v. Leon,* 468 *U.S.* 897, 104 *S.Ct.* 3405, 82 *L. Ed.*2d 677 (1984)). Nevertheless, assuming arguendo violations of the ECPA and California law, we would not invoke the exclusionary rule of this state.

The purpose of the exclusionary rule is to act as a "deterrent safeguard to ensure that the Fourth Amendment is not reduced to 'a form of words.'" *Mapp v. Ohio,* 367 *U.S.* 643, 648, 81 *S.Ct.* 1684, 1688, 6 *L.Ed.*2d 1081, 1086 (1961) (quoting *Silverthorne Lumber Co. v. United States,* 251 *U.S.* 385, 392, 40 *S.Ct.* 182, 183, 64 *L.Ed.* 319, 321 (1920)). "[T]he 'prime purpose' of the rule, if not the sole one, 'is to deter future unlawful police conduct.'" *United States v. Janis,* 428 *U.S.* 433, 446, 96 *S.Ct.* 3021, 3028, 49 *L.Ed.*2d 1046, 1056 (1976) (quoting *United States v. Calandra,* 414 *U.S.* 338, 347, 94 *S.Ct.* 613, 619, 38 *L. Ed.*2d 561, 571 (1974)). *See also Elkins v. United States,* 364 *U.S.* 206, 217, 80 *S.Ct.* 1437, 1444, 4 *L.Ed.*2d 1669, 1677 (1960) ("The [exclusionary] rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."). Other than deterrence, the exclusionary rule advances the "imperative of judicial integrity" and removes the profit motive from "lawless behavior." 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 1.5(c) (3d ed. 1996 & Supp.2003). *See also State v. Mollica, supra,* 114 *N.J.* at 353–54, 554 *A.*2d 1315.

Ordinarily, this state's exclusionary rule will not be invoked to bar otherwise reliable and relevant evidence gathered by law enforcement officers of another jurisdiction over which our state has no control or authority, when those officers act in conformity with the Federal Constitution. *Mollica, supra,* 114 *N.J.* at 347–49, 554 *A.*2d 1315. "The prospect of deterrence is more remote, as is the judicial taint from acceptance of the evidence," when New Jersey public officers have not profited from their own wrongdoing. 1 LaFave, *supra,* § 1.5(c).

In *State v. Mollica, supra,* federal officers, without a warrant, secured telephone billing records of an occupant of a hotel and turned the records over to state law enforcement authorities, who used the information to obtain a search warrant for Mollica's hotel room. The federal officers acted independently of state authorities and in conformity with federal law in seizing the telephone billing records. 114 *N.J.* at 334–35, 554 *A.*2d 1315. Article I, Paragraph 7, however, requires state officials to secure a search warrant before seizing telephone billing records. *Id.* at 345, 554 *A.*2d 1315. *See also State v. Hunt,* 91 *N.J.* 338, 348, 450 *A.*2d 952 (1982). Nevertheless, we held that it was not unlawful for state law enforcement officers to use the information conveyed to them by the federal authorities for the purpose of establishing probable cause to issue a search warrant for Mollica's hotel room. *Mollica, supra,* 114 *N.J.* at 349–50, 554 *A.*2d 1315. We recognized that the absence of any agency or control over another jurisdiction's law enforcement authorities limited the application of the constitutional standards of this state, *id.* at 349, 554 *A.*2d 1315, and that "the application of the state constitution to the officers of another jurisdiction would disserve the principles of federalism and comity, without properly advancing legitimate state interests," *id.* at 353, 554 *A.*2d 1315.

In *State v. Minter,* 116 *N.J.* 269, 561 *A.*2d 570 (1989), similarly, federal agents conducted an investigation in accordance with federal wiretap law and intercepted a telephone call that would have been admissible in a federal court proceeding. The federal agents, however, did not follow procedures demanded of state agents under New Jersey's wiretap law. *Id.* at 271, 276, 561 *A.*2d 570. The failure of a state agent to comply with state law results in the exclusion of the evidence in a state prosecution. *Id.* at 278–79, 561 *A.*2d 570. Nevertheless, respecting the notion of federalism, we held that "no principles or policies of the exclusionary rule would call for the categorical exclusion from state court proceedings of wiretap evidence that has been obtained by federal officers in accordance with federal law but not state wiretap requirements." *Id.* at 280, 561 *A.*2d 570.

In *State v. Knight,* 145 *N.J.* 233, 240–41, 243, 678 *A.*2d 642 (1996), a federal agent, acting in conformity with federal law, interrogated a defendant in California, who was under indictment in New Jersey. Article I, Paragraph 10 of the New Jersey Constitution generally prohibits state law enforcement officers from initiating a conversation with a defendant after indictment without the consent of counsel. *N.J. Const.* art. I, ¶ 10; *State v. Sanchez,* 129 *N.J.* 261, 277, 279, 609 *A.*2d 400 (1992). In *Knight,* we found a sufficient record to conclude that the federal investigator was acting as an agent of a New Jersey prosecutor's office when he interrogated the defendant, and we required the exclusion of the evidence under our state law. 145 *N.J.* at 258–61, 678 *A.*2d 642.

The analysis in this case, however, is different from *Mollica* and *Minter,* where the federal officers were acting in conformity with the federal law, and from *Knight,* where a federal officer was acting in concert with state authorities. Here, defendant alleges that DiMatteo was acting in violation of the law of his jurisdiction—California, and federal law—the ECPA. There is no suggestion that DiMatteo was acting in concert with New Jersey authorities.

The securing of evidence in violation of the Fourth Amendment in another state would require New Jersey, pursuant to the Supremacy Clause, to apply the exclusionary rule as though the evidence had been wrongfully obtained here. *U.S. Const.* art. VI, cl. 2. *See also Mapp, supra,* 367 *U.S.* at 651, 81 *S.Ct.* at 1689–90, 6 *L.Ed.*2d at 1087; *Elkins, supra,* 364 *U.S.* at 221–22, 80 *S.Ct.* at 1446, 4 *L.Ed.*2d at 1679–80. The question is whether it would be sound policy to exclude from a criminal prosecution in New Jersey the fruits of a violation of local law of another jurisdiction by a law enforcement officer of that jurisdiction. *See* 1 LaFave, *supra,* § 1.5(c).

None of New Jersey's interests ordinarily advanced by the exclusionary rule would be vindicated in this case by suppressing the evidence gathered out-of-state. There is no allegation of

insolence in office by New Jersey law enforcement authorities or any suggestion that Nutley Detective Meehan played any role in, or indeed had any knowledge of, the issuance of the California warrant served on AOL in Virginia. Any of the alleged defects in the use and service of the California warrant were not of a constitutional dimension in the prosecution of a case in New Jersey. Undoubtedly, AOL understood that it could raise a jurisdictional objection to a California warrant served by mail on its Virginia headquarters. AOL's compliance with the extra-territorial warrant, moreover, may subject it to a possible civil suit by defendant. *See* 18 *U.S.C.A.* § 2707(a). But suppressing evidence voluntarily given by AOL to California law enforcement authorities would further no deterrent purpose under the laws of New Jersey.

The courts of other jurisdictions have reached similar results. In *State v. Lucas,* 372 *N.W.*2d 731, 735–36 (Minn.1985), the issue was whether telephone conversations taped in Wisconsin, allegedly in violation of Wisconsin law, were admissible in a Minnesota murder prosecution. Although the Minnesota Supreme Court ultimately decided that the law of neither state was violated by the means the police used to secure the evidence, it enunciated the principle guiding its exclusionary rule:

> It is clear that evidence obtained in another state in violation of the Federal Constitution is subject to the same rule of exclusion that would apply if the evidence had been obtained in this state. There is, however, no requirement that evidence obtained in another state be excluded in this state merely because it would be inadmissible if the prosecution were in that other state.
>
> [*Id.* at 736 (citations omitted).]

*See also Burge v. Estelle,* 496 *F.*2d 1177, 1178 (5th Cir.1974) (holding that "Texas as the forum state may choose its own standards for determining the admissibility of evidence [gathered in Oklahoma] so long as minimum federal constitutional standards are honored," and that Texas is not bound by "Oklahoma's choice of a deterrent").

In conclusion, no New Jersey official engaged or participated in any unlawful conduct in the acquisition of the Evers' subscriber

information in Virginia. To apply the exclusionary rule would advance none of its purposes—deterrence, judicial integrity, and imposing a cost on illicit behavior—and would disserve the process of doing justice in this state by preventing the introduction of reliable and relevant evidence in a criminal prosecution. Use of that evidence in this state will not offend the integrity of our judicial process. There may be circumstances in which the procuring of evidence by the agents of another jurisdiction, although in compliance with the Federal Constitution, would so offend the judicial conscience and our state's basic notions of fairness and justice that our courts would not countenance the admission of such evidence in a trial. But this is not such a case. We therefore hold that the subscriber information obtained by AOL was properly used by Nutley Detective Meehan in securing a warrant for the search of defendant's home.

## C.

Defendant also claims that Detective Meehan's affidavit did not provide probable cause to justify a warrant to search his home. More particularly, he argues that the AOL billing address for screen name "BTE324" did not answer the question whether "BTE324" actually used the computer for illicit purposes at the same location, and therefore, that there was not a well-grounded suspicion that a search of the Evers' home would yield evidence of child pornography. We disagree. In the present circumstances, the billing address of the Internet screen name—a screen name that had e-mailed photographs of child pornography—was a logical place to search for evidence of the identity of the holder of the screen name and evidence of the crime.

The Fourth Amendment and Article I, Paragraph 7 enjoin a judge from issuing a search warrant unless probable cause is established in the record. Our analysis begins with a review of the four corners of Detective Meehan's affidavit and the "totality of circumstances" presented in that affidavit to determine the sufficiency of information offered in support of the warrant.

*Illinois v. Gates,* 462 *U.S.* 213, 230–31, 103 *S.Ct.* 2317, 2328, 76 *L.Ed.*2d 527, 543–44 (1983); *State v. Sullivan,* 169 *N.J.* 204, 210–12, 777 *A.*2d 60 (2001). Before issuing any warrant, a judge must be satisfied that there is probable cause to believe that a crime has been or is being committed at a specific location or that evidence of a crime is at the place to be searched. *Sullivan, supra,* 169 *N.J.* at 210–11, 777 *A.*2d 60; *State v. Laws,* 50 *N.J.* 159, 173, 233 *A.*2d 633 (1967), *cert. denied,* 393 *U.S.* 971, 89 *S.Ct.* 408, 21 *L.Ed.*2d 384 (1968); *State v. Macri,* 39 *N.J.* 250, 256–57, 188 *A.*2d 389 (1963). Probable cause has been defined in many different ways, defying scientific precision. It is a "common-sense, practical standard" dealing with "probabilities" and the "practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Sullivan, supra,* 169 *N.J.* at 211, 777 *A.*2d 60 (internal quotation marks omitted). Probable cause is "less than legal evidence necessary to convict though more than mere naked suspicion." *State v. Mark,* 46 *N.J.* 262, 271, 216 *A.*2d 377 (1966). It is a 'well grounded' suspicion that a crime has been or is being committed" at a particular place. *State v. Waltz,* 61 *N.J.* 83, 87, 293 *A.*2d 167 (1972) (quoting *State v. Burnett,* 42 *N.J.* 377, 387, 201 *A.*2d 39 (1964)).

Our constitutional jurisprudence has a preference for searches conducted with warrants. *United States v. Ventresca,* 380 *U.S.* 102, 109, 85 *S.Ct.* 741, 746, 13 *L.Ed.*2d 684, 689 (1965); *State v. Valencia,* 93 *N.J.* 126, 138, 459 *A.*2d 1149 (1983); *State v. Kasabucki,* 52 *N.J.* 110, 115–16, 244 *A.*2d 101 (1968). A search warrant is presumed to be valid, and defendant bears the burden of demonstrating that the warrant was issued without probable cause or that the search was otherwise unreasonable. *Valencia, supra,* 93 *N.J.* at 133, 459 *A.*2d 1149. *See also Gates, supra,* 462 *U.S.* at 236, 103 *S.Ct.* at 2331, 76 *L.Ed.*2d at 546–47; *Kasabucki, supra,* 52 *N.J.* at 117, 244 *A.*2d 101. Therefore, substantial deference must be paid by a reviewing court to the determination of the judge who has made a finding of probable cause to issue a search warrant.

We conclude that Detective Meehan's affidavit met the standard of probable cause. That affidavit, in addition to providing Meehan's qualifications, training, and law enforcement experience, described with particularity the details of his investigation. Detective Meehan received the California case file of Deputy Sheriff DiMatteo on April 29, 1999, which revealed the following:

(1) In February 1999, Deputy Sheriff DiMatteo entered a child pornography chat room entitled "NOxHAIRxYET."

(2) DiMatteo typed his screen name into a program that listed him at the chat room site.

(3) On February 15, 1999, at 9:35 p.m., Pacific Standard Time, DiMatteo checked his account and found an e-mail containing two pictures of a naked child from a sender with the screen name "BTE324." Both photographs were reviewed by Detective Meehan, who determined that the individuals depicted appeared to be under the age of sixteen and that the photographs represented "both child pornography and child erotica."

(4) In response to a warrant served on AOL, it was learned that the billing account for "BTE324" was in the name of Elayne Evers of Nutley, New Jersey.

(5) Detective Meehan explained how child pornographers rarely destroy the photographs and images of their prurient interest and that "child pornography may be stored on electronic media such as computers, hard drives, computer diskettes, magnetic or digital tapes and computer CD–ROMs."

(6) Detective Meehan expressed an opinion based on his experience and training that there was probable cause to believe "the account of Elayne Evers of [address omitted] Nutley, New Jersey under the screen name of BTE324, engaged in child pornography in violation of the New Jersey Penal Code Statute 2C:24–4b, 'Endangering the Welfare of Children.'"

(7) Detective Meehan requested a court order to seize "any and all computers, computer programs, hard and soft drives, any and all information which may lead to the identity of the individuals

using the screen name BTE324 which is being used in the distribution of this child pornography."

We are living in a world in which computers are a common feature of our society. Computers are in use in both homes and businesses, and, with the advent of the laptop, in almost every other conceivable place. Business people and students leave their homes with laptops, use them at other locations, and return home with them. The billing address of an account tied to a computer screen name may not be an absolute guarantee that the holder of the computer screen name used the computer at the billing address to commit criminal activity, but there is a fair and logical inference that the computer will *probably* be found at that address and, if not, at least evidence of the identity of the holder of the screen name will be found there. This simple and sensible conclusion has been reached by other courts as well. *See, e.g., United States v. Campos,* 221 *F.*3d 1143, 1145 (10th Cir.2000) (upholding validity of search warrant for defendant's residence after "[l]aw enforcement agents determined that AOL subscriber who used the name 'IAMZEUS' was [defendant]"); *Hause v. Commonwealth,* 83 *S.W.*3d 1, 4–5, 11–12 (Ky.Ct.App.2001) (upholding validity of search warrant for defendant's residence that was supported by subscriber information obtained from AOL through California search warrant, also by Deputy Sheriff DiMatteo, and verification of address by Kentucky law enforcement officials).

We also conclude that there was probable cause to believe that the pornographic images of children would be retained on the computer of the person using screen name "BTE324." Detective Meehan set forth his particularized reasons for this belief in his affidavit. There is solid precedent for Meehan's investigative reasoning. In *United States v. Lamb,* 945 *F.Supp.* 441, 460 (N.D.N.Y.1996), the district court found:

> The observation that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes is supported by common sense and the cases. Since the materials are illegal to distribute and possess, initial collection is difficult. Having succeeded in obtaining images, collectors are unlikely to quickly destroy them. Because of their illegality and the

imprimatur of severe social stigma such images carry, collectors will want to secret them in secure places, like a private residence. This proposition is not novel in either state or federal court: pedophiles, preferential child molesters, and child pornography collectors maintain their materials for significant periods of time. [*See also United States v. Cox*, 190 *F.Supp.*2d 330, 333–34 (N.D.N.Y.2002) (quoting *Lamb* ).]

Unlike *State v. Kline*, 42 *N.J.* 135, 138, 199 *A.*2d 650 (1964), a case in which a search pursuant to a warrant was held invalid because "[n]o facts or circumstances were set forth in the affidavit which afforded reasonable grounds to believe that bookmaking was being carried on in the home," in the present case, the reasonable and natural inferences were that evidence of the crime would be found in the home. Before applying for the search warrant in this case, Detective Meehan ascertained that the billing address was, in fact, a residence.

The privacy interests of the home are entitled to the highest degree of respect and protection in the framework of our constitutional system, and in securing a warrant for the search of a home, law enforcement authorities should present reliable and accessible information to establish probable cause. There is nothing in the present record to indicate whether or not it was possible to determine the precise point of transmission of the e-mail sent to Deputy Sheriff DiMatteo. At oral argument, the State admitted that it did not know whether such information was obtainable. We note with approval that in several other cases, law enforcement officials took additional steps to verify that the computers from which offending images were sent were located in the defendants' residences. *See, e.g., United States v. Bender*, 290 *F.*3d 1279, 1281 (11th Cir.2002) (noting that search warrant was based on information subpoenaed from AOL and BellSouth "that revealed that the person sending the e-mails [containing child pornography] used a computer located at [defendant's address]"), *cert. denied,* —— *U.S.* ——, 123 *S.Ct.* 571, 154 *L.Ed.*2d 457 (2002); *Cox, supra,* 190 *F.Supp.*2d at 334 (denying motion to suppress where affidavit used to secure search warrant "detailed the daily AOL account activity, 'most notably between 6 p.m. and 2 a.m.' "); *Lamb, supra,* 945 *F.Supp.* at 446, 460 (denying motion to suppress

and noting that after AOL subscriber information was released pursuant to federal grand jury subpoena, "[f]urther investigation confirmed that a computer equipped with a modem was located in defendant's home" and that it "was used to access AOL"). Although there is nothing in the record to suggest that such additional information was available in this case, law enforcement officers should, when possible, turn to available sources of information which may give greater accuracy to the probable cause determination. The Fourth Amendment and Article I, Paragraph 7 do not render ignorance bliss.

We do not suggest that if it were possible to obtain the precise point of transmission in this case, the failure to do so would have invalidated the warrant. However, technological advances, if they do not already, may soon permit law enforcement officers to determine easily through Internet service providers the exact point of transmission of personal computer e-mail. A single billing account for an Internet service provider, such as AOL, may cover the charges for a number of computers used by different members of a family. Given the mobility of our society, even that of the nuclear family, some computers may be at home and others in more distant locations. For example, parents may pay the account for computers used by their children in college. A laptop computer can be used at any number of locations other than the billing address. For this reason, a judge reviewing an application for the search of a home should make certain that reliable information, which is accessible in a timely manner, is utilized in making the probable cause determination of the locale of a computer used for criminal purposes. In other words, our courts must consider the new realities of our ever-expanding technological world. Nonetheless, the proofs in support of a search warrant will continue to be examined in a common-sense and not a hypertechnical manner. *See Ventresca, supra*, 380 *U.S.* at 109, 85 *S.Ct.* at 746, 13 *L.Ed.*2d at 689.

We are satisfied that the probable cause standard for the issuance of a search warrant was met in this case.

### III.

We must also determine whether the trial court appropriately applied the "serious injustice" standard enunciated in *N.J.S.A.* 2C:44–1d in sentencing defendant to a probationary term for second-degree child endangerment. The Appellate Division panel unanimously affirmed the trial court's downgrade of the child pornography distribution charge from a second-degree to a third-degree offense for sentencing purposes. The panel, however, was not unanimous in affirming the imposition of a probationary sentence conditioned on a 364–day custodial term in the county jail based on the trial court's determination that the presumption of imprisonment had been overcome.

In dissenting, Judge Steinberg concluded that in this child pornography case, defendant's background was probably "not unlike many others who commit similar offenses," and that the record did not support a finding that "imprisonment would be a serious injustice which overrides the need to deter such conduct by others" under *N.J.S.A.* 2C:44–1d.

We conclude that the presumption of imprisonment for this second-degree offense was not overcome and that the factual findings in support of a probationary sentence were in part based on irrelevant and inappropriate factors, and were otherwise not adequately supported by the record. We therefore reverse and remand for resentencing.

### A.

It is well settled that when reviewing a trial court's sentencing decision, "[a]n appellate court may not substitute its judgment for that of the trial court." *State v. Johnson,* 118 *N.J.* 10, 15, 570 *A.*2d 395 (1990) (citing *State v. O'Donnell,* 117 *N.J.* 210, 215, 564 *A.*2d 1202 (1989)). However, an appellate court may review and modify a sentence when the trial court's determination was "'clearly mistaken.'" *State v. Jabbour,* 118 *N.J.* 1, 6, 570 *A.*2d 391 (1990) (internal quotation marks omitted) (quoting *State*

*v. Jarbath,* 114 *N.J.* 394, 401, 555 *A.*2d 559 (1989)). Within these limitations, an appellate court can

"(a) review sentences to determine if the legislative policies, here the sentencing guidelines, were violated; (b) review the aggravating and mitigating factors found below to determine whether those factors were based upon competent credible evidence in the record; and (c) determine whether, even though the court sentenced in accordance with the guidelines, nevertheless the application of the guidelines to the facts of this case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[*Ibid.* (quoting *State v. Roth,* 95 *N.J.* 334, 364–65, 471 *A.*2d 370 (1984)).]

■■■ The guiding purpose of the New Jersey Code of Criminal Justice (Code) is clear—punishment, rather than rehabilitation, for wrongful acts. *Jabbour, supra,* 118 *N.J.* at 6, 570 *A.*2d 391; *Roth, supra,* 95 *N.J.* at 353–56, 471 *A.*2d 370. To achieve that purpose, as well as uniformity in sentencing, the Code "channel[s] the discretion of trial courts" by focusing on the gravity of the offense rather than the offender's blameworthiness or capacity for rehabilitation. *Jabbour, supra,* 118 *N.J.* at 6, 570 *A.*2d 391 (citing *State v. Hodge,* 95 *N.J.* 369, 375, 471 *A.*2d 389 (1984); *Roth, supra,* 95 *N.J.* at 355, 471 *A.*2d 370).

The Code guides the discretion of judges through a system of grading crimes into four degrees and presumptive sentencing. *See N.J.S.A.* 2C:1–4; *N.J.S.A.* 2C:43–1; *Roth, supra,* 95 *N.J.* at 356, 471 *A.*2d 370. A crime of the first-degree, the most serious on the scale, ordinarily has a range of sentence of between ten and twenty years of imprisonment, *N.J.S.A.* 2C:43–6a(1), with a presumptive sentence of fifteen years, which may increase or decrease depending on the weighing of the mitigating and aggravating factors, *N.J.S.A.* 2C:44–1f(1)(b). If the mitigating and aggravating factors are in equipoise, the presumptive term applies. *Ibid.* A second-degree crime has a sentencing range of between five and ten years, *N.J.S.A.* 2C:43–6a(2), with a presumptive sentence of seven years, *N.J.S.A.* 2C:44–1f(1)(c).

To further channel the discretion of the judge, the Code applies a presumption of imprisonment to a person convicted of a first- or second-degree crime, *N.J.S.A.* 2C:44–1d, and applies a presumption of non-imprisonment to a person convicted of a third- or

fourth-degree crime who is a first time offender, *N.J.S.A.* 2C:44–1e. "[W]here the court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands," the court may sentence a person convicted of a crime of the first- or second-degree within the sentencing ranges of crimes one degree lower. *N.J.S.A.* 2C:44–1f(2). The presumption of imprisonment for first- and second-degree crimes, however, comes into play regardless whether a defendant has led a crime-free or blameless life.

Defendant seeks to overcome the presumption of imprisonment that applies to his conviction of a second-degree crime, so we look to the relevant statute and case law to determine whether he has met his burden. The Code provides that a sentencing court

> *shall* deal with a person who has been convicted of a crime of the first or second degree by imposing a sentence of imprisonment *unless, having regard to the character and condition of the defendant, it is of the opinion that his imprisonment would be a serious injustice which overrides the need to deter such conduct by others.*
>
> [*N.J.S.A.* 2C:44–1d (emphasis added).]

Absent a proper finding of "serious injustice" that outweighs the need for general deterrence, a trial court must impose a custodial sentence, *Roth, supra*, 95 *N.J.* at 358–59, 471 A.2d 370, unless the defendant has been found eligible for an alternative sentence specifically authorized by the Code, *State v. Soricelli*, 156 *N.J.* 525, 537–38, 722 A.2d 95 (1999). The presumption of imprisonment is not dispelled merely because the trial court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and the interests of justice justify downgrading a first- or second-degree offense pursuant to *N.J.S.A.* 2C:44–1f(2). *Jabbour, supra*, 118 *N.J.* at 7, 570 A.2d 391. In that event, the trial court must nevertheless impose a term of imprisonment within the downgraded sentencing range because the presumption of imprisonment is determined "not by the sentence imposed[,] but by the offense for which a defendant is convicted," *State v. O'Connor*, 105 *N.J.* 399, 404–05, 522 A.2d 423 (1987).

The downgrading of an offense is not a prerequisite to finding that the presumption of imprisonment for a first- or second-degree conviction has been overcome. *Jarbath, supra,* 114 *N.J.* at 413, 555 *A.*2d 559. The standard for overcoming the presumption of imprisonment is distinct from that for downgrading an offense. Moreover, the reasons offered to dispel the presumption of imprisonment must be even more compelling than those that might warrant downgrading an offense. *State v. Megargel,* 143 *N.J.* 484, 498–502, 673 *A.*2d 259 (1996).

In permitting consideration of "the character and condition of the defendant" in determining whether imprisonment would be a "serious injustice," the Code left "a residuum of power in the sentencing court not to imprison in those few cases where it would be entirely inappropriate to do so." *Roth, supra,* 95 *N.J.* at 358, 471 *A.*2d 370 (internal quotation marks omitted). One of the central purposes of the Code was to avoid the imposition of disproportionate sentences. *See Jarbath, supra,* 114 *N.J.* at 408, 555 *A.*2d 559. We have consistently held that this residuum of power may be legitimately exercised in those "truly extraordinary and unanticipated" cases where the "human cost" of punishing a particular defendant to deter others from committing his offense would be "too great." *State v. Rivera,* 124 *N.J.* 122, 125, 590 *A.*2d 238 (1991) (internal quotation marks omitted); *Roth, supra,* 95 *N.J.* at 358, 471 *A.*2d 370 (internal quotation marks omitted).

In only one case to date, *State v. Jarbath, supra,* 114 *N.J.* 394, 555 *A.*2d 559, has this Court had occasion to hold that the "serious injustice" standard was satisfied, overcoming the presumption of imprisonment. In *Jarbath,* we observed, "[f]or example," that one group within the class of cases where the standard might be met includes those "instances where the character and condition of the defendant are so idiosyncratic that incarceration or extended imprisonment for the purposes of general deterrence is not warranted." *Id.* at 408, 555 *A.*2d 559. Jarbath was a psychotic, mentally retarded woman, who caused the death of her nineteen-day-old son "after she twice accidentally dropped him on a coffee

table." *Id.* at 398, 555 *A.*2d 559. She was charged with the murder of her son and pled guilty to the lesser offense of reckless manslaughter. *Ibid.* While in prison, Jarbath was abused almost daily by other inmates and attempted to commit suicide. *Ibid.* We observed that the imprisonment of an emotionally impaired mother involved in "the accidental killing of a baby," a defendant who could not sufficiently comprehend the " 'wrongfulness of her conduct,' " would not further any recognized goal of general deterrence. *Id.* at 405–06, 555 *A.*2d 559. We also noted that Jarbath, due to her impaired condition, could not "endure life in prison without unusual suffering" and privation that greatly exceeded what a relatively normal person could bear under similar circumstances. *Id.* at 409, 555 *A.*2d 559.

In such a case, we found that "general deterrence unrelated to specific deterrence has relatively insignificant penal value." *Id.* at 405, 555 *A.*2d 559. We also found that it was highly unlikely that the imprisonment of Jarbath would be the type of example needed to deter others from neglecting their parental or child-care responsibilities. *Id.* at 405–06, 555 *A.*2d 559. The sum of her condition and character—and the level of her culpability on the continuum of reckless manslaughter—led us to conclude that the defendant's imprisonment constituted a serious injustice outweighing the "needs of general deterrence." *Id.* at 408–09, 555 A.2d 559. *See also State v. E.R.,* 273 *N.J.Super.* 262, 265, 269, 273–74, 641 *A.*2d 1072 (App.Div.1994) (affirming resentencing of defendant with full-blown AIDS who pled guilty to second-degree possession of pipe bombs from seven-year-custodial to five-year-probationary term, where imprisonment would entail excessive hardship to defendant because specific deterrence was no longer consideration in light of his undisputed physical incapacity and imminent death within six months).

In all other Code cases, this Court rejected the defendants' claims that the sum of their circumstances was so rare and extraordinary that the human cost of their punishment exceeded the need to deter others from committing like offenses. *See*

*Jabbour, supra,* 118 *N.J.* at 3–4, 8–9, 570 *A.*2d 391 (vacating five-year probationary sentence of youthful, first-time offender who pled guilty to second-degree sexual assault of four-year-old, despite his promising rehabilitation prospects given intense psychiatric counseling); *Johnson, supra,* 118 *N.J.* at 14–20, 570 *A.*2d 395 (vacating five-year probationary sentence of first-time offender who pled guilty to two counts of first-degree aggravated sexual assault of young stepdaughter, despite his deafness and drug dependent condition and his status as sole economic support for his primarily deaf family); *State v. Kelly,* 97 *N.J.* 178, 188, 219–20, 478 *A.*2d 364 (1984) (holding that five-year custodial sentence imposed on battered woman convicted of reckless manslaughter of abusive spouse did not constitute serious injustice, despite "children's need to have their mother at home"); *Roth, supra,* 95 *N.J.* at 340–41, 366–69, 471 *A.*2d 370 (vacating five-year probationary sentence of first-time offender who pled guilty to first-degree aggravated sexual assault by forcing young mother strolling with infant to perform sexual act on defendant at knifepoint, despite severe substance abuse problems, "abject remorse" for his conduct, "broad range of community support," and cooperation with law enforcement authorities). *See also Soricelli, supra,* 156 *N.J.* at 526, 528–32, 537–40, 722 *A.*2d 95 (vacating three-and-one-half-year probationary sentence of defendant who pled guilty to second-degree possession of PCP with intent to distribute, despite rehabilitation, "responsible employment in his own restaurant," and assumption of "child-support and visitation obligations"); *Rivera, supra,* 124 *N.J.* at 123–27, 590 *A.*2d 238 (vacating illegal two-year suspension of imposition of sentence of defendant who pled guilty to second-degree robbery, despite link between defendant's addiction and offense); *O'Connor, supra,* 105 *N.J.* at 402, 405–08, 410–11, 522 *A.*2d 423 (vacating three-year probationary sentence of first-time offender who pled guilty to second-degree aggravated arson, in absence of any finding that presumption of imprisonment had been overcome); *Hodge, supra,* 95 *N.J.* at 371–72, 378–80, 471 *A.*2d 389 (vacating five-year probationary sentence conditioned on sixty-three days' imprisonment of first-time offender who pled

guilty to first-degree aggravated sexual assault of thirteen-year-old step-daughter, despite his support of his family and good rehabilitation prospects).

A review of these cases suggests the heavy burden borne by a defendant who seeks to overcome the presumption of imprisonment. The common thread running through each is the focus on the gravity of the offense, which implicates the need for specific and general deterrence. In none of these cases was the defendant able to show that his character and condition were so unique or extraordinary, when compared to the class of defendants facing similar terms of incarceration, that he was entitled to relief from the presumption of imprisonment.

Our case law has amply described those instances that do not meet the "serious injustice" standard. Our jurisprudence, however, has not given the trial courts guideposts for determining the extraordinary or extremely unusual case where the human cost of imprisoning a defendant for the sake of deterrence constitutes a serious injustice. The standard must be more than "I know it when I see it."

The Code, as well as our previous case law, provides the analytical framework in which to set standards for defining when the "character and condition" of a defendant is so unusual or unique that imprisonment would be a "serious injustice" overriding the State's paramount concern for deterrence. We need only look to *N.J.S.A.* 2C:44–1b to find factors to be considered in determining whether the "character and condition" of a defendant is so highly unusual or unique as to meet the "serious injustice" standard. The Code provides for the weighing of aggravating and mitigating factors in calculating the specific term of imprisonment within a sentencing range. *N.J.S.A.* 2C:43–6a; *N.J.S.A.* 2C:44–1a, –1b, –1f(1). In those circumstances where the mitigating factors outweigh the aggravating factors, a judge is authorized to impose a sentence below the presumptive term. *N.J.S.A.* 2C:44–1f(1). In those cases where the trial court is "clearly convinced that the mitigating factors substantially outweigh the aggravating

factors and where the interest of justice demands," the court may sentence a person convicted of a crime of the first- or second-degree within the sentencing range of a crime one degree lower. *N.J.S.A.* 2C:44–1f(2). In *Megargel, supra,* 143 *N.J.* at 498–501, 673 *A.*2d 259, we recognized that the serious injustice standard which determines whether a defendant is "in or out" of prison must necessarily be higher than the standard for downgrading an offense under *N.J.S.A.* 2C:44–1f(2).

*N.J.S.A.* 2C:44–1b sets forth the mitigating factors to be considered by the trial court generally in imposing sentence:

(1) The defendant's conduct neither caused nor threatened serious harm;

(2) The defendant did not contemplate that his conduct would cause or threaten serious harm;

(3) The defendant acted under a strong provocation;

(4) There were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense;

(5) The victim of the defendant's conduct induced or facilitated its commission;

(6) The defendant has compensated or will compensate the victim of his conduct for the damage or injury that he sustained, or will participate in a program of community service;

(7) The defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense;

(8) The defendant's conduct was a result of circumstances unlikely to recur;

(9) The character and attitude of the defendant indicate that he is unlikely to commit another offense;

(10) The defendant is particularly likely to respond affirmatively to probationary treatment;

(11) The imprisonment of the defendant would entail excessive hardship to himself or his dependents;

(12) The willingness of the defendant to cooperate with law enforcement authorities;

(13) The conduct of a youthful defendant was substantially influenced by another person more mature than the defendant.

[*N.J.S.A.* 2C:44–1b.]

In deciding whether the "character and condition" of a defendant meets the "serious injustice" standard, a trial court should determine whether there is clear and convincing evidence that there are relevant mitigating factors present to an *extraordi-*

*nary* degree and, if so, whether cumulatively, they so greatly exceed any aggravating factors that imprisonment would constitute a serious injustice overriding the need for deterrence. We do not suggest that every mitigating factor will bear the same relevance and weight in assessing the character and condition of the defendant; it is the quality of the factor or factors and their uniqueness in the particular setting that matters.

In determining the role that deterrence should play in the serious injustice standard, we begin by restating that there is a presumption of imprisonment for those convicted of first- and second-degree crimes. *N.J.S.A.* 2C:44–1d. However, a violation of a criminal statute may be more or less egregious depending on the particular facts. "In evaluating the severity of the crime, the trial court must consider the nature of and the relevant circumstances pertaining to the offense. Every offense arises in different factual circumstances." *Megargel, supra,* 143 *N.J.* at 500, 673 *A.*2d 259. For example, in *Jarbath, supra,* the Court in assessing the defendant's culpability for manslaughter, referred to the criminal act as "accidental," and focused on the severe mental retardation of the defendant. 114 *N.J.* at 405–06, 555 *A.*2d 559. We have noted that "[c]ourts should consider a defendant's role in the incident to determine the need to deter him from further crimes and the corresponding need to protect the public from him." *Megargel, supra,* 143 *N.J.* at 501, 673 *A.*2d 259. " '[D]emands for deterrence are strengthened in direct proportion to the gravity and harm[ful]ness of the offense and the deliberateness of the offender.' " *Id.* at 501, 673 *A.*2d 259 (second alteration added) (quoting *State in the Interest of C.A.H. & B.A.R.,* 89 *N.J.* 326, 337, 446 *A.*2d 93 (1982)).

 Accordingly, trial courts should look to the statutory sentencing mitigating factors and determine whether those factors are present to such an extraordinary degree and so greatly exceed the aggravating factors that a particular defendant is distinguished from the "heartland" of cases for the particular offense. *See U.S. Sentencing Guidelines Manual* § 5K2.0 cmt. (2001)

(discussing grounds for departure from sentencing range established by applicable guidelines). It is the quality of the extraordinary mitigating factors taken together that must be weighed in deciding whether the "serious injustice" standard has been met. The trial court also must look at the gravity of the offense with respect to the peculiar facts of a case to determine how paramount deterrence will be in the equation. Generally, for first- and second-degree crimes there will be an overwhelming presumption that deterrence will be of value.

The standard we articulate today has been intuitively applied in such cases as *Jarbath* and is consistent with this Court's jurisprudence on the "serious injustice" standard.

## B.

At defendant's sentencing hearing, the trial court found two aggravating factors: the risk that defendant would commit another crime, *N.J.S.A.* 2C:44-1a(3), as indicated by his Avenel report and the need to deter defendant and others from violating the law, *N.J.S.A.* 2C:44-1a(9). The court found four mitigating factors: that defendant did not contemplate his conduct would cause or threaten serious harm, *N.J.S.A.* 2C:44-1b(2); that he had no history of prior criminal conduct, *N.J.S.A.* 2C:44-1b(7); that he was particularly likely to respond affirmatively to probationary treatment, *N.J.S.A.* 2C:44-1b(10); and that he had willingly cooperated with law enforcement authorities by giving a complete statement to the police and not contesting the facts of his case, *N.J.S.A.* 2C:44-1b(12). The court was clearly convinced that the mitigating factors substantially outweighed the aggravating factors. The court then determined that the interests of justice demanded that defendant be sentenced as if his second-degree distribution offense were a crime of the third-degree, *N.J.S.A.* 2C:44-1f(2).

Among the factors the trial court found favoring defendant were the following: (1) "defendant's conduct arose out of completely legal viewing of adult pornography, and he apparently entered the

particular chat room for child pornography by accident"; (2) there was no suggestion that defendant "originated, created or manufactured the image transmitted, nor did the defendant transmit anything to children or attempt to contact any children"; (3) at the outset of the case the State initially recommended a sentence of "three years flat," the low end of the sentencing range for third-degree offenses; (4) defendant had voluntarily entered into long-term psychological treatment to "deal with his issues"; and (5) he was not accused of sexually gratifying himself with or in front of children, which would be no more than a third-degree offense pursuant to *N.J.S.A.* 2C:24–4a in any event. Based on these considerations, the trial judge found that imposing a second-degree sentence would be "disproportionate" when compared to other child endangerment crimes and "second-degree crimes in general."

The trial judge, after evaluating the character and condition of defendant, determined that imprisonment "would be a serious injustice which overrides the need for deterrence," and gave her specific reasons:

> From all indications defendant is a middle-aged man who has maintained a stable, long-term marriage and a home in which he and his wife are raising an adolescent daughter. Defendant has worked in the construction field as a mason to support his family.

> There is evidence of involvement in school and community activities, and apart from this situation, a total absence of criminal behavior in his life. The court is told that this entire house of cards will collapse if defendant is sent to prison.

> Defendant engaged in the activity in question without any appreciation that it was criminalized. Without diminishing his conduct in any way and the fact that it perpetuated the growing market for what is called cyber-porn, it is the court's view that the participation of others in this evil network will not be deterred by sending this bit player to prison. He should be viewed differently than someone who originates or manufactures the offending material.

> The deterrence of defendant himself is being accomplished by the embarrassment and anxiety of this pending case and the prospect of imprisonment. The appropriate penal objectives can be satisfied by long-term supervision, coupled with specific treatment, and the life-time requirements of Megan's Law.

> That is what the defendant's journey into the dark side of the [I]nternet has brought down upon himself and his family.

Looking at the total picture presented of this individual standing before this court, I find that justice will not be served by sending him to prison, and the interests of society do not require it.

## C.

■ There is sufficient credible evidence in the record supporting the trial court's finding of the mitigating and aggravating factors and the weighing of those factors. The question remains whether the trial judge properly exercised her discretion within the "residuum of power" permitted by *N.J.S.A.* 2C:44–1d by imposing a probationary sentence. We therefore turn to the trial court's factual findings offered to justify overcoming the presumption of imprisonment for the second-degree distribution conviction. Although the propriety of downgrading the child pornography distribution charge from a second-degree to a third-degree offense for the purpose of sentencing is not raised in this appeal, we necessarily examine the judge's findings to the extent they were used as building blocks in determining that the presumption of imprisonment was overcome.

To the extent that the judge relied on the following factors to meet the serious injustice standard, we cannot conclude that they are credibly supported by the record before us, or so extraordinary as to dispel the presumption of imprisonment.

(1) The finding that defendant "apparently entered the particular chat room for child pornography by accident" is difficult to reconcile with defendant's confession that he knew of "hundreds" of child pornography web sites and interacted with many of them, including "under 15, 10, 11, 12 year old triple X[sic]." The sheer scope of defendant's knowledge of child pornography Internet sources and his affirmative acts of visiting those sites on a daily basis for a period of six weeks while requesting and disseminating such pornography belie the notion that defendant's descent into the world of child pornography was "accidental."

(2) Although the "voluntary" nature of defendant's entrance into long-term psychological treatment to "deal with his issue" is

to be commended and entitled to weight as a "mitigating factor" in determining the downgrade or length of his sentence, when addressing the "serious injustice" standard, this Court cannot ignore that defendant's initial psychological evaluation occurred some eleven months after his arrest. The record also reveals that defendant was "at best, ambivalent regarding psychotherapy" and "[did] not believe he need[ed] any psychotherapy," and only began attending psychotherapy sessions approximately seventeen months after his arrest and six months before his March 16, 2001 sentencing.

(3) The State's initial plea agreement offer, which was rejected by defendant prior to the grand jury's return of the superseding indictment, was not a relevant sentencing factor. *N.J.S.A.* 2C:44–1c(1); *N.J.R.E.* 410; *State v. Pennington,* 154 *N.J.* 344, 362–63, 712 *A.*2d 1133 (1998). Statements made by a prosecutor or defense attorney during plea negotiations, which do not result in a guilty plea, are generally inadmissible. Plea offers are tendered for a multitude of reasons, some of which address a prosecutor's desire to conserve scarce resources, or to avoid anticipated proof problems at trial. *See* Biunno, *Current New Jersey Rules of Evidence,* comment on *N.J.R.E.* 410 (2002) (noting that "[i]t would appear obvious that evidence that the State agreed or offered to accept a plea should not be admissible as proof of the invalidity or weakness of the State's charges," because "[t]o hold otherwise would . . . impair the plea-bargaining process which has become a critical part of the administration of criminal justice"). Moreover, the State neither renewed its offer nor extended another after return of the superseding indictment, which added forty-two counts of possession of child pornography.

(4) Although it may be reassuring that defendant did not commit more serious crimes such as creating or manufacturing child pornography, attempting to interact with children on the Internet, or sexually gratifying himself in front of children, the proof of this negative is irrelevant to defendant's culpability for the sole sec-

ond-degree crime that he was charged with and convicted of: the knowing distribution of child pornography.

(5) The trial judge concluded that imposing a second-degree sentence would be "disproportionate in relation to the treatment of crime under other sections of the statute and second-degree crimes in general." In reaching this conclusion, she plainly exceeded her judicial prerogative by substituting her will for the clear intent of the statute. The Legislature weighed the evil and harm caused by the trade in child pornography and graded the act of distribution as a second-degree crime. That was a legislative prerogative. Deciding the wisdom of the statute is not a judicial prerogative. *N.J. Sports & Expo. Auth. v. McCrane*, 61 *N.J.* 1, 8, 292 *A.*2d 545, *appeal dismissed sub nom. Borough of E. Rutherford v. N.J. Sports & Expo. Auth.*, 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972).

We cannot agree with other findings of the trial judge as well. For example, we are not persuaded that "[d]efendant engaged in the activity in question without any appreciation that it was criminalized." Indeed, defendant visited child pornography websites every morning for six weeks until he was afraid he might be "caught." He continued, however, reviewing his personal library of favorite photographs daily even after he stopped visiting those websites.

Moreover, defendant readily admitted that he distributed the offending photographs for the express purpose of encouraging the recipients to reciprocate by sending him more child pornography in return. That is exactly the type of trafficking the Legislature meant to shut down in order to stop the demand for and perpetuation of the sexual exploitation of children. Defendant's so-called "bit player" role in the child pornography industry nevertheless brought him within the sweep of the second-degree crime of distribution and does not dispel the notion that his imprisonment would deter others from, in the trial judge's words, "perpetuat[ing] the growing market for ... cyber-porn" by soliciting and disseminating child pornography. This statute treats the distribu-

tion of child pornography as severely as a robbery, burglary, and significant theft. However harsh the grading of this offense may appear, that was the intent of the Legislature.

Finally, defendant's status as a first-time offender, "family man," "breadwinner," and esteemed member of the community, however commendable and worthy of consideration in deciding the length of his term of incarceration, is not so extraordinary as to alter the conclusion that his imprisonment would not constitute a serious injustice overriding the need for deterrence. *Compare, e.g., Jabbour, supra,* 118 *N.J.* at 8, 570 *A.*2d 391; *Johnson, supra,* 118 *N.J.* at 17, 570 *A.*2d 395. Without in any way diminishing the rigors of prison life, we cannot find that defendant will face "hardship and privation greatly exceeding that which would be accepted and endured by ordinary inmates." *Jarbath, supra,* 114 *N.J.* at 409, 555 *A.*2d 559.

The Legislature enacted this section of the child pornography statute to halt the sexual exploitation of children by making child pornography trafficking a second-degree offense. *See Senate Judiciary Comm. Statement to S. 1843* (Dec. 8, 1983) (stating that 1984 amendment to *N.J.S.A.* 2C:24–4b was intended to "expand the scope of the child pornography statute by adding language indicating that the procuring, manufacturing, giving, providing, lending, trading, mailing, delivering, transferring, publishing, distributing, circulating, disseminating, presenting, exhibiting, advertising, offering or agreeing to offer pornography material depicting children is also prohibited"); *Sponsor Statement to S. 1843* (Oct. 25, 1982) (stating that "[t]he purpose of this bill is to fortify the child pornography law" by making above-listed acts "crime[s] of the second degree"). The judge's estimation that the offense of child pornography distribution has been improperly graded by the Legislature has absolutely no bearing on the appropriate punishment for defendant's distribution crime—" '[t]he judiciary does not determine the punishment for crimes. That is up to the Legislature.' " *Soricelli, supra,* 156 *N.J.* at 538, 722 *A.*2d 95 (quoting *State v. Cannon,* 128 *N.J.* 546, 559–60, 608 *A.*2d 341 (1992)).

We realize this adherence to the sentencing guidelines "may seem harsh, but 'that is the consequence of the legislative scheme,'" *Jabbour, supra,* 118 *N.J.* at 9, 570 *A.2d* 391 (quoting *State v. Dunbar,* 108 *N.J.* 80, 83, 527 *A.2d* 1346 (1987)), which creates a presumption of imprisonment for second-degree child endangerment by the dissemination of child pornography. Although we appreciate the judge's familiarity with defendant's circumstances, and we recognize that defendant's "previously blameless life evoke[s] compassion," *Roth, supra,* 95 *N.J.* at 368, 471 *A.2d* 370, we cannot agree that the sum of those circumstances is so rare and extraordinary that the "human cost" of defendant's imprisonment exceeds society's imperative need to deter others from disseminating child pornography. Accordingly, we hold that the trial judge erred in concluding that defendant's imprisonment for his second-degree distribution conviction would constitute a serious injustice overriding the need for deterrence.

The decision we reach in this case should not suggest that the serious injustice standard can only be met by a mentally retarded defendant with little appreciation of his or her wrong-doing or by a terminally-ill AIDS patient. Although it may be the rare case that satisfies the "serious injustice" standard, trial courts need not be afraid to examine whether the character and condition of a defendant in a particular case meet this rigorous test.

## IV.

We affirm the judgment of the Appellate Division with respect to defendant's appeal, reverse with respect to the State's appeal, and remand the matter to the Law Division for resentencing consistent with this opinion.

Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA and ZAZZALI join in Justice ALBIN's opinion. Justice COLEMAN filed a separate concurring opinion.

*For affirmance in part; reversal in part; and remandment*—Chief Justice PORITZ, and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI and ALBIN—7.

*Opposed*—None.

COLEMAN, J., concurring in the Court's judgment.

I write separately to express the view that, although some of the Fourth Amendment discussion in the Court's opinion is not essential to the disposition of this appeal, I nonetheless concur in the Court's judgment.

Justice Verniero joins in this opinion.