**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3781-18T4

STATE OF NEW JERSEY,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

OSHER EISEMANN,

      Defendant-Respondent/
      Cross-Appellant.

---

Argued October 15, 2020 – Decided December 31, 2020

Before Judges Alvarez and Sumners.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 18-04-0059.

Lauren Bonfiglio, Deputy Attorney General, argued the cause for appellant/cross-respondent (Gurbir S. Grewal, Attorney General, attorney; Lauren Bonfiglio, of counsel and on the briefs).

Melissa Wernick and Lee D. Vartan argued the cause for respondent/cross-appellant (Chiesa Shahinian &

Giantomasi, PC, attorneys; Lee D. Vartan, on the briefs).

PER CURIAM

A jury convicted defendant Osher Eisemann of two second-degree offenses: financial facilitation (money laundering), N.J.S.A. 2C:21-25(b)(1) (count three), and misconduct by a corporate official, N.J.S.A. 2C:21-9(c) and 2C:20-3(a) (count five). On April 29, 2019, the trial judge sentenced defendant to two downgraded concurrent two-year terms of probation, each requiring sixty days county jail time. He imposed the mandatory $250,000 penalty for money laundering. N.J.S.A. 2C:21-27.2(a). The judgment of conviction (JOC) was subsequently amended to reflect the mandatory consecutive sentence terms requirement found in N.J.S.A. 2C:21-27(c), of which the judge was initially unaware. The aggregate sentence was unchanged, however, as the judge restructured the terms of probation to one year, made them consecutive, and on each required defendant serve thirty days county jail time. For the reasons that follow, we affirm the convictions, but vacate and remand for resentencing before another judge.

Defendant founded a school for children with disabilities in 1993. Shortly thereafter, he incorporated a foundation to act as a fundraising organization for the school. Defendant was the executive director of the school and the

2

foundation; he served as the president of the foundation board of trustees. The school, although private, educates children placed by public school sending districts. The school is mainly funded, not by private donations, but by the tuition paid on behalf of public school students—in other words, local, state, and federal money. Thus, it is subject to regulation and oversight by the New Jersey Department of Education (DOE), including the calculation of annual tuition.

In June 2016, six search warrants were issued, supported by the New Jersey Division of Criminal Justice Detective Thomas Page's affidavit. The warrants, each for a specific place connected to the school, sought evidence regarding misapplication of entrusted property, N.J.S.A. 2C:21-15, and tampering with public records or information, N.J.S.A. 2C:28-7. After the seizure of the records, a state grand jury returned an indictment, later superseded by a charging document that included another offense, corruption of public resources, N.J.S.A. 2C:27-12(a)(1) and N.J.S.A. 2C:2-6.[1] Additionally, the original count three was replaced with the following:

(Financial Facilitation of Criminal Activity – Second Degree)

OSHER EISEMANN
and

---

[1] The foundation was also charged with several offenses, but was acquitted at trial.

between on or about March 1, 2015, and on or about April 30, 2015, at the City of Edison, in the County of Middlesex, elsewhere, and within the jurisdiction of this Court, did engage in one or more transactions involving property, to wit: funds of $75,000 or more, which the said OSHER EISEMANN and SERVICES FOR HIDDEN INTELLIGENCE, LLC knew or which a reasonable person would believe to be derived from criminal activity to wit: Theft By Unlawful Taking, Misapplication of Entrusted Property or Property of Government, or Misconduct By Corporate Official, with the intent to facilitate or promote the criminal activity or knowing that the transaction(s) were designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the property derived from criminal activity, that is the said OSHER EISEMANN or SERVICES FOR HIDDEN INTELLIGENCE, LLC, did transfer $75,000 or more in funds paid or donated to a private school for the handicapped, as identified to the Grand Jury, knowing that it was stolen or misapplied, to one or more entities or persons for the purpose of concealing or disguising the nature, location, source, ownership or control of the funds, contrary to the provisions of N.J.S.A. 2C:21-25(b), N.J.S.A. 2C:21-27 and N.J.S.A. 2C:2-6, and against the peace of this State, the government and dignity of the same.

Between grand jury presentations, defendant filed an unsuccessful motion to suppress the evidence seized pursuant to the search warrants. The motion to dismiss the superseding indictment was later also denied. Defendant's motions for judgment of acquittal or a new trial were not successful either.

A-3781-18T4

At trial, the State presented a number of witnesses, including investigators who examined the seized records and discovered the transactions for which defendant was indicted. Specifically, Page testified regarding defendant's transfer of funds, which the State alleged as designed to make it appear that he repaid a $200,000 debt he owed to the school. The process included the issuance of two cashier's checks out of the school's accounts totaling $230,000 in March 2015. Of that sum, a $200,000 cashier's check was made payable to GZYD, a non-profit entity in the business of making small short-term loans to citizens in the Lakewood community.

The director of GZYD, Jonathan Rubin, testified that in mid-March 2015, defendant asked him to deposit a check for $200,000 into the GZYD account. Defendant explained to Rubin it was a loan he was concerned would get lost in litigation, and he asked Rubin to draw a check in that amount to TAZ Apparel, a defunct online women's clothing company in which defendant had been a partner with Aaron Gottlieb.

Gottlieb testified that defendant called and asked him to deposit the $200,000 in a TAZ Apparel account and write defendant a check from the account in that amount. Gottlieb did so, without asking questions about the

transaction. Defendant wired the $200,000 into one of the school accounts, thus appearing on paper to pay an existing debt he owed to the school.

Deputy Chief of Detectives William Frederick, of the Division of Criminal Justice Financial and Computer Crimes Bureau, also testified on behalf of the State. He reviewed various account books and records of the school, and the foundation, in furtherance of the investigation. He too testified regarding the transactions that Page, Rubin, and Gottlieb described—and the fact that defendant's $200,000 debt to the school was effectively eliminated by the circular series of transactions that began with a withdrawal of $200,000 from a school account. We discuss the motions, jury charges, and sentence below.

Now on appeal, defendant raises the following points:

> POINT I
>
> THE CONVICTIONS SHOULD BE VACATED BECAUSE THE JURY INSTRUCTIONS FOR COUNT 3 WERE CLEARLY INCORRECT.
>
> POINT II
>
> THE CONVICTIONS SHOULD BE VACATED BECAUSE THE SUPERSEDING INDICTMENT WAS FACIALLY INCONSISTENT, AND EISEMANN PREPARED AND OFFERED HIS DEFENSE IN RELIANCE ON THE ORIGINAL PROPOSED JURY INSTRUCTIONS.

POINT III

THE CONVICTIONS SHOULD BE VACATED BECAUSE THERE WAS NO PERMANENT DEPRIVATION.

POINT IV

THE CONVICTIONS SHOULD BE VACATED BECAUSE THE INTERPRETATION OF [DOE] REGULATIONS WAS FOR THE TRIAL COURT, NOT FOR THE JURY.

POINT V

THE CONVICTIONS SHOULD BE VACATED BECAUSE THERE WAS NO EVIDENCE THAT EISEMANN UNLAWFULLY EXERCISED CONTROL OVER PRIVATE DOLLARS.

POINT VI

THE CONVICTIONS SHOULD BE VACATED BECAUSE THERE WAS NO EVIDENCE THAT EISEMANN USED THE FOUNDATION TO COMMIT THE CRIME OF FINANCIAL FACILITATION.

POINT VII

THE CONVICTIONS SHOULD BE VACATED BECAUSE PROSECUTORS AND PAGE KNOWINGLY PRESENTED FALSE TESTIMONY TO TWO GRAND JURIES IN VIOLATION OF STATE V. HOGAN.

A.    Page Testified Before The First Grand Jury About One School Bank Account Only, Even

7                                                    A-3781-18T4

Though He Knew The School Had Multiple Bank Accounts, And Also Knew That If There Were Sufficient Private Dollars Across All Accounts, Then There Was "No Crime."

B.   Page Again Testified About One School Bank Account Before the Second Grand Jury, And Added To His Testimony That There Were Insufficient Private Dollars In That Account To Pay For The "Criminal" Transactions Even Though Page Admitted At Trial That He Never Knew The Amount Of Public Or Private Dollars Deposited Into That, Or Any, Account.

POINT VIII

THE CONVICTIONS SHOULD BE VACATED BECAUSE EISEMANN'S SUPPRESSION MOTION WAS DENIED IN ERROR, AND THE SIX SEARCH WARRANTS WERE OVERBROAD, GENERAL WARRANTS.

The State raises one point on cross-appeal:

POINT IX

DEFENDANT'S ILLEGAL SENTENCE MUST BE VACATED AND REMANDED FOR RESENTENCING AS IT IS NOT WITHIN THE SENTENCING GUIDELINES AND DEFENDANT FAILED TO MEET HIS HEAVY BURDEN OF OVERCOMING THE PRESUMPTION OF IMPRISONMENT.

1.   Mitigating factor two, defendant did not contemplate that his conduct would cause or threaten serious harm, N.J.S.A. 2C:44-1(b)(2).

8

2. Mitigating factor four, substantial grounds tending to excuse defendant's conduct, N.J.S.A. 2C:44-1(b)(4).

3. Mitigating factor six, defendant will compensate the victim of his conduct for the damage or injury sustained, N.J.S.A. 2C:44-1(b)(6).

4. Mitigating factor eight, defendant's conduct was the result of circumstances unlikely to recur, N.J.S.A. 2C:44-1(b)(8).

I.

Defendant was acquitted of first-degree corruption of public resources, N.J.S.A. 2C:27-12(a)(1) and 2-6 (count one); second-degree theft by unlawful taking, N.J.S.A. 2C:20-3 and 2-6 (count two); and second-degree misapplication of entrusted property and property of government, N.J.S.A. 2C:21-15 and 2-6 (count four). Those counts are addressed in defendant's points four, five, and seven.

Some of defendant's arguments relate to counts regarding his alleged misuse of public funds, but none of the charges of which defendant was convicted require proof of the source of the funds, i.e. whether public or private. DOE regulations, also included in defendant's claims of error, were relevant only to the theft charge. Whether or not defendant unlawfully exercised control over private or public dollars is not relevant to the conviction for money laundering.

Nor is defendant's claim in point seven—that the convictions should be vacated because Page "knowingly presented false testimony to two grand juries" regarding whether funds were from public sources or from private donations—relevant to the convictions.

Defendant does not even suggest Page lied at trial. Once a jury convicts, the verdict establishes probable cause to indict, and a purported error is rendered harmless. See State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994). Defendant claims Page's seeming confusion during some of his testimony before the grand jury about the source of funds, which defendant alleges was a "lie," has nothing to do with money laundering. We do not address defendant's points on appeal involving charges of which he was acquitted; they do not warrant further discussion in a written opinion. R. 2:11-3(e)(2).

II.

Jury instructions are "a road map to guide the jury[.]" State v. McKinney, 223 N.J. 475, 495 (2015) (quoting State v. Martin, 119 N.J. 2, 15 (1990)).

> The trial court has clear directives with regard to what must be included in the charge. The judge "should explain to the jury in an understandable fashion its function in relation to the legal issues involved." The trial judge must deliver "a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." The trial judge must "instruct the jury as to

the fundamental principles of law which control the case [including] the definition of the crime, the commission of which is basic to the prosecution against the defendant."

[Ibid. (alteration in original) (citations omitted).]

We review the claims regarding the instructions for harmless error because defendant objected to the jury instructions at trial.[2] Willner v. Vertical Reality, Inc., 235 N.J. 65, 79 (2018). "The harmless error standard requires that there be some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." State v. Lazo, 209 N.J. 9, 26 (2012) (alterations in original) (quotations omitted) (quoting State v. R.B., 183 N.J. 308, 330 (2005)).

However, "[b]ecause proper jury instructions are essential to a fair trial, 'erroneous instructions on material points are presumed to' possess the capacity to unfairly prejudice the defendant." McKinney, 223 N.J. at 495 (quoting State v. Bunch, 180 N.J. 534, 541-42 (2004)). Jury instructions are therefore poor candidates for rehabilitation under the harmless error theory. Id. at 495-96.

---

[2] Defendant objected to the instruction the judge gave the jury as to count five, misconduct by a corporate official. He suggested language, some of which the judge adopted, on the instruction given as to count three, money laundering.

In this case, defendant's argument is based on a misapprehension of the law defining the crime of money laundering. He argues the instruction should have made clear a conviction on count three could only be sustained if he was convicted on counts two, four, or five. However, the statute, N.J.S.A. 2C:21-25(b)(1), "does not require that a particular underlying crime be set in motion." State v. Harris, 373 N.J. Super. 253, 267 (App. Div. 2004). In other words, the jury is not required to convict a defendant of a specific predicate offense before convicting him of money laundering. "An independent predicate offense is not necessary to the prosecution of the promotion prong of New Jersey's money laundering statute." Ibid.; see also State v. Diorio, 216 N.J. 598, 624 (2014). Defendant was convicted under the "promotion prong" of N.J.S.A. 2C:21-25(b)(1). For that reason, the trial court's instruction was not "clearly incorrect."

In any event, defendant was convicted of an independent offense, misconduct by a corporate official. This, for purposes of the money laundering statute, is a criminal activity. The model jury charge states that "[a]ny criminal activity will suffice." Model Jury Charge (Criminal), "Financial Facilitation of Criminal Activity (N.J.S.A. 2C:21-25(b)(1))" (approved June 2009).

The trial judge informed the jury, in accord with the model jury charge, that "the defendant need not have known that the subject property was derived from specific unlawful activity[.]" <u>See</u> <u>Model Jury Charge (Criminal)</u>, "Financial Facilitation of Criminal Activity (N.J.S.A. 2C:21-25(b)(1))" (approved June 2009). Additionally, the trial judge told the jury that the State identified the criminal activity and listed the three other counts, theft, misapplication, and misconduct. In reliance on his argument that the jury charges were fatally flawed because the jury did not convict defendant of one of the other charges, defendant cites to federal caselaw. But defendant was convicted of misconduct by a corporate official. And the federal precedents are not dispositive of the question.

Defendant also argues the instructions led to an illogical verdict because defendant was convicted of facilitating the predicate offense of corporate misconduct and of corporate misconduct for the predicate offense of facilitation of criminal activity. We do not accept the premise, which requires us to speculate as to the reasons the jury reached its verdict, which would be improper. Even inconsistent verdicts are permitted "[s]o long as the evidence is sufficient to support a conviction on the substantive offense beyond a reasonable doubt[.]" <u>State v. Grey</u>, 147 N.J. 4, 10 (1996). All that is necessary is for a defendant to

know that the money or property being laundered was derived from an illicit activity. As the jury instructions adequately stated the law, this argument lacks merit.

III.

Defendant next contends the prosecution's presentation in the second grand jury proceeding confused the classification of the money, public or private, used in the $200,000 transaction that formed the basis for count three. He argues this made the superseding indictment "facially inconsistent." Defendant also argues the theory presented to the grand jury—that the $200,000 was strictly public money—differed from the theory presented to the trial jury in the final instructions—that the $200,000 was either public or private money. Defendant claims his defense was tailored to the original theory, but the jury convicted him on the revised theory. Defendant's trial strategy decisions are not a basis for reversal. Furthermore, since the distinction is not relevant, the argument fails. Nonetheless, we address it.

Count three of the original indictment stated defendant and the foundation "engage[d] in one or more transactions involving approximately $200,000 <u>in public funds paid by one or more public school districts</u> in the State of New Jersey . . . knowing that it was stolen or misapplied . . . ." Count three of the

superseding indictment, however, stated defendant and the foundation "did transfer $75,000 or more in funds paid or donated to a private school . . . knowing that it was stolen or misapplied . . . ."

Based on this change in language in the superseding indictment, the prosecution's theory now included use of public or private money (referring to the "donated" funds). In the second grand jury proceeding, the prosecutor and Page often referred to the generic "school money," and they did not distinguish between public and private money throughout the proceeding.

Additionally, at the second grand jury proceeding, the prosecutor initially stated that defendant "misused and stole public funds and monies that were intended to be used to operate a school . . . ." Page stated his investigation involved defendant's "utilization of school public funds" and that "public school money" meant "money . . . given to the school by the school districts." Page confirmed the money defendant moved from the school to the foundation to TAZ Apparel was "public money"; he knew the money was meant "for the operation of [the school]" because "[i]t was school money . . . being deposited from the district to the school's account."

Up until that point, Page had exclusively discussed defendant's use of "public money" and had referred to it colloquially as "school money." After

walking through several of the suspect transactions, Page reiterated that he knew money was "publicly sourced" because "[i]t came out of the school account."

Page was then asked about private donations, which he confirmed constituted a portion of the money in the school's account, but explained there was never enough "nonpublic private donations" to cover the transactions. At this point it is reasonable to assume, based on Page's testimony, that while there may have been some privately sourced money in the school's account, the suspected transactions were funded entirely by "public money."

However, some confusion, on which defendant seems to base his contention, did ensue. Page confirmed "the total misuse of public money [was] approximately $779,000." The prosecutor then asked Page about the "redirection of public money" that went from the school and eventually back into the school's account, rather than to one of defendant's private ventures.[3] Page responded, "[t]hat was just school money." When the prosecutor asked Page about "public money," he responded that it was "school money." This is confusing because Page had previously referred to public money as school

---

[3] To be clear, this transaction, from the school eventually back to the school, was the factual basis for Count Three.

money; although his use of "just" would imply that Page was differentiating the $200,000 from "public money."

Page then walked through the transaction: $200,000 from the school to GZYD to TAZ Apparel to defendant and then finally back to the school as a repayment of his debt. Neither Page nor the prosecutor referred again to the source of the money used in the transaction. The prosecutor asked, and Page affirmed, that with the $200,000 transaction, "the total theft amount" of the investigation was $979,000. The prosecutor added the $200,000 to the $779,000 "total misuse of public money," implying that the $200,000 was not public money. Given that count three ultimately specifically referred to donated funds in addition to public funds, it is clear that the State claimed the pertinent transaction was funded by both public and private money, and that the judge's instruction properly tracked that language.

## IV.

Citing exclusively to federal caselaw, defendant argues the superseding indictment was defective because it contained logically inconsistent counts. Nothing in New Jersey law prohibits the State from charging inconsistent offenses, even if we were to assume for the sake of argument defendant's description is accurate. So long as the proofs independently support the

17

convictions on counts three and five beyond a reasonable doubt, the point lacks merit. See Grey, 147 N.J. at 10.

## V.

Defendant argues in point two that defendant cannot be convicted of money laundering if the funds at issue were private. No law supports the proposition. The money laundering statute covers all crimes, not just those involving public funds. No further discussion is warranted. R. 2:11-3(e)(2).

## VI.

Defendant also contends that the convictions should be vacated because there was no permanent deprivation of funds. This argument also lacks merit. It is undisputed that the withdrawal of the $200,000 from the school was temporary. The improper removal of funds, "laundering" through two corporate accounts and return, was intended to do nothing more than to create the fiction that a loan had been repaid. That the funds were put back in short order does not defeat either conviction. No further discussion is warranted. R. 2:11-3(e)(2).

## VII.

In his sixth point, defendant contends that in order to establish guilt on count five, the State had to prove that he used or controlled a corporation, in this

case the foundation, "for the furtherance or promotion of any criminal object[,]" and that he did so purposely or knowingly. N.J.S.A. 2C:21-9(c); see also Model Jury Charges (Criminal), "Misconduct by Corporate Official" (N.J.S.A. 2C:21-9(c)) (approved Feb. 2017). Defendant argues that since the State did not introduce evidence that he personally dealt with the foundation accounts, he cannot be held criminally responsible for the $200,000 transaction. Thus, defendant reasons, his motion for acquittal should have been granted.

At trial, Frederick detailed the transactions, beginning with removal of $200,000 from the school account, the movement of funds through various accounts as corroborated by Page, Rubin, and Gottlieb, and the final redeposit of the money into the school account. Frederick testified that the foundation ledgers recorded an increase in loans receivable based on a $200,000 loan made to GZYD and later reflected a $200,000 reduction to a loan payable by defendant. Page's testimony traced the money from bank account records, traveling from a school account to GZYD's account by check, from GZYD's account to TAZ's account by check, from TAZ's account to defendant's account by check, and then from defendant's account to a school account by wire transfer. Rubin and Gottlieb confirmed that the GZYD and TAZ transfers were done under defendant's direction.

An appellate court reviews the denial of a motion for acquittal de novo, using the same standard as the trial court. State v. Cruz-Pena, 459 N.J. Super. 513, 520 (App. Div. 2019). "We must determine whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." Ibid. (quoting State v. Dekowski, 218 N.J. 596, 608 (2014)). Defendant simply failed to meet that standard.

A reasonable jury could find guilt of the offense after giving the State the benefit of all favorable testimony and all favorable inferences. Separate witnesses testified regarding the transactions recorded in the books of various entities through which the funds traveled. Thus, the motion for acquittal was properly denied.

Although not mentioned in the point heading as required by the rule,[4] defendant now objects that Frederick should not have been permitted to testify as an expert, as his opinions were inadmissible lay opinions. In support of that position, defendant cites to an unpublished decision that mentions in dicta that forensic accountants should not offer lay opinions.

---

[4] R. 2:6-2(a)(6).

An unpublished opinion is not precedential. R. 1:36-3. Furthermore, Frederick was not an outside accountant performing an independent audit, as was the expert in the unpublished opinion to which defendant draws our attention, but rather a detective investigating financial records. During Frederick's testimony, the trial judge entertained repeated objections from defense counsel, sustaining two when Frederick's testimony appeared to move into the realm of expert opinion rather than perceptions. His testimony was appropriately limited to his examination of financial records and was entirely admissible. This issue has no merit.

## VIII.

In reviewing a motion to suppress, appellate courts "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Lamb, 218 N.J. 300, 313 (2014). However, a "trial court's interpretation of the law . . . and the consequences that flow from established facts are not entitled to any special deference" and is de novo. Ibid. "[A]ppellate courts should reverse only when the trial court's determination is 'so clearly mistaken "that the interests of justice demand intervention and correction."'" Ibid. (quoting State v. Elders, 192 N.J. 224, 244 (2007)).

Defendant contends that the convictions should be vacated because the search warrants themselves were drafted so as to give investigators unfettered discretion rather than limiting any seizure to items by the use of specific language and temporal limitations. Defendant points out that those temporal limitations and more specific language were actually contained in the supporting affidavits, and were therefore readily available.

General search warrants are prohibited by the Fourth Amendment. State v. Bivins, 226 N.J. 1, 12 (2016). But the search warrant applications here limited the seizure to evidence of the crimes of misapplication of entrusted property and tampering with public records or information, including payments, payroll, employee records, government contracts, communications, and finances. Given the complexity of the alleged schemes, the peculiar nature of the proofs themselves, the number of accounts involved and their locations, and the substantial sums involved in the investigation, the application language is not overbroad.

As to temporal limitations, documentation on payroll and employee records were limited to between 2011 and 2015. That only some records were limited temporally, but others were not, does not satisfy defendant's high burden of overcoming the presumptive validity of the warrant.

The New Jersey case upon which defendant relies, State v. Muldowney, 60 N.J. 594 (1972), concerns alleged violations of obscenity laws. That search warrant was drafted to require the seizing officer to subjectively assess whether an item was obscene, with obvious First Amendment implications. Id. at 603-04. That is a far different scenario than this, where officers were investigating a complicated financial scheme involving the potential theft of hundreds of thousands of dollars, involving both public and private funds. Defendant was being investigated for suspected financial criminal activity spanning many years, based on the creation and maintenance of numerous bank accounts and involving several business entities, including two that had no relationship to each other or the school. Thus, this point lacks merit.

IX.

Finally, we reach the State's cross-appeal, filed pursuant to N.J.S.A. 2C:44-1(f)(2). The State challenges as inconsistent with the Criminal Code defendant's sentence to consecutive terms of one-year probation, each subject to thirty days in county jail, on two second-degree crimes. We agree that the sentence does not comply with the Code and remand for resentencing before another judge.

The State's ability to appeal a sentence is limited by double jeopardy principles and is ordinarily permissible only when authorized by statute or the sentence is illegal. State v. Hyland, 452 N.J. Super. 372, 380 (App. Div. 2017), aff'd as modified, 238 N.J. 135 (2019); State v. Chambers, 377 N.J. Super. 365, 369-70 (App. Div. 2005). In this case, the State appeals pursuant to N.J.S.A. 2C:44-1(f)(2), which authorizes such action when the trial court downgrades a conviction and imposes a noncustodial or probationary term for a first- or second-degree crime. N.J.S.A. 2C:44-1(f)(2).[5]

Our Code's sentencing laws are premised on three principles: (1) sentences should be based on "structured discretion designed to foster less arbitrary and more equal sentences"; (2) punishment should fit the crime, not the criminal; and (3) sentences should be subject to meaningful appellate review to promote uniformity. State v. Roth, 95 N.J. 334, 345-49, 361 (1984).

The Legislature's "dominant, if not paramount, goal" in devising the Code's sentencing scheme was to promote "uniformity in sentencing." State v. Fuentes, 217 N.J. 57, 71 (2014) (quoting State v. Natale, 184 N.J. 458, 485 (2005)). To that end, the Legislature "replaced 'the unfettered sentencing

_____

[5] Although not entirely clear, the judge states he is also analyzing the sentence as a downgrade.

A-3781-18T4

discretion of prior law with a structured discretion designed to foster less arbitrary and more equal sentences.'" Ibid. (quoting Natale, 184 N.J. at 485). Thus, crimes are categorized by degree with the following corresponding sentencing ranges: ten-to-twenty years for a first-degree crime; five-to-ten years for a second-degree crime; three-to-five years for a third-degree crime; and up to eighteen months for a fourth-degree crime. Id. at 72; N.J.S.A. 2C:43-6(a)(1)-(4).

Within the applicable range, the sentencing court exercises discretion in fixing the term by qualitatively weighing the aggravating and mitigating factors listed in N.J.S.A. 2C:44-1(a) and (b). State v. Case, 220 N.J. 49, 65 (2014); State v. Sainz, 107 N.J. 283, 288 (1987). Those factors take into account the personal characteristics of the defendant, as well as the particular circumstances of the crime, to ensure an individualized assessment, while maintaining uniformity and predictability in sentencing. See Case, 220 N.J. at 63; State v. Jaffe, 220 N.J. 114, 116 (2014). The process preserves "the Legislature's intention to focus on the degree of the crime itself as opposed to other factors personal to the defendant." State v. Hodge, 95 N.J. 369, 377 (1984).

"The factors are not interchangeable on a one-to-one basis. The proper weight to be given to each is a function of its gravity in relation to the severity

of the offense." Roth, 95 N.J. at 368. Where a factor is amply supported by the record, the court is not free to disregard it, but has discretion in determining the weight the factor should receive. State v. Dalziel, 182 N.J. 494, 504-05 (2005). "Careful application" of the factors promotes uniformity in sentencing. State v. Cassady, 198 N.J. 165, 179-80 (2009). A reviewing court will defer to the trial court's findings so long as they are "based upon competent credible evidence in the record." Fuentes, 217 N.J. at 74 (quotations omitted). We do not overturn a trial court's sentence unless it reflects "clear error of judgment" or "'shocks the judicial conscience.'" State v. Blackmon, 202 N.J. 283, 297 (2010) (quoting Roth, 95 N.J. at 363-65).

The Code subjects first- and second-degree crimes to a presumption of imprisonment with limited exception for truly extraordinary cases.[6] In relevant part, N.J.S.A. 2C:44-1(d) provides:

> The court shall deal with a person who has been convicted of a crime of the first or second degree . . . by imposing a sentence of imprisonment unless, having regard to the character and condition of the defendant, it is of the opinion that his [or her] imprisonment would be a serious injustice which overrides the need to deter such conduct by others.

---

[6] Most crimes of the third degree and crimes of the fourth degree are subject to a presumption of non-imprisonment for first-time offenders. N.J.S.A. 2C:44-1(d) and (e).

Where the presumption of imprisonment applies, the court must impose a term of incarceration "[a]bsent a proper finding of 'serious injustice' that outweighs the need for general deterrence." State v. Evers, 175 N.J. 355, 388 (2003) (quoting Roth, 95 N.J. at 358-59). The presumption "is not satisfied by a term of imprisonment imposed as a condition of probation." State v. O'Connor, 105 N.J. 399, 402 (1987); State v. Lebra, 357 N.J. Super. 500, 507-08 (App. Div. 2003).

The serious injustice standard vests in the trial court a "residuum of power" to forego imprisonment "in those few cases where it would be entirely inappropriate" to sentence to state prison. Evers, 175 N.J. at 389 (quoting Roth, 95 N.J. at 358). That residuum of power is legitimately exercised only in "truly extraordinary and unanticipated cases where the human cost of punishing a particular defendant to deter others from committing his offense would be too great." Ibid. (quotations omitted).

In limited cases, a sentencing court may also downgrade a crime of the first- or second-degree to one degree lower for sentencing purposes. State v. Trinidad, 241 N.J. 425, 454-55 (2020). The Code provides:

> In cases of convictions for crimes of the first or second degree where the court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice

27

demands, the court may sentence the defendant to a term appropriate to a crime of one degree lower than that of the crime for which he was convicted.

[N.J.S.A. 2C:44-1(f)(2).]

In deciding whether a downgrade is appropriate, the focus must be on the crime because the downgrade statute "is an offense-oriented provision." State v. Lake, 408 N.J. Super. 313, 328 (App. Div. 2009).

A trial court should not downgrade if the "surrounding circumstances of an offense" do not "make it very similar to a lower degree offense." State v. Megargel, 143 N.J. 484, 500 (1996) (explaining that a downgrade from first- to second-degree robbery may be justified where the defendant did not have a weapon but "simulate[d] having a gun by placing his hand in his pocket").

"The paramount reason we focus on the severity of the crime is to assure the protection of the public and the deterrence of others. The higher the degree of the crime, the greater the public need for protection and the more need for deterrence." Ibid. Where the crime includes an enhanced penalty, the Legislature has declared the crime especially serious, thus elevating the need for deterrence. Id. at 501-02. Accord State v. Maguire, 84 N.J. 508, 513-14 (1980). "Under such circumstances, trial courts must exercise extreme caution," before ordering a downgrade. Megargel, 143 N.J. at 502. In all cases "[t]he reasons

justifying a downgrade must be 'compelling,' and something in addition to and separate from, the mitigating factors that substantially outweigh the aggravating factors." Id. at 505.

Where the court downgrades a crime subject to the presumption of imprisonment, the presumption applies regardless of the downgrade. Evers, 175 N.J. at 388. As the Court explained,

> The presumption of imprisonment is not dispelled merely because the trial court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and the interests of justice justify downgrading a first- or second-degree offense pursuant to N.J.S.A. 2C:44–1f(2). [State v. Jabbour, 118 N.J. 1, 7 (1990)]. In that event, the trial court must nevertheless impose a term of imprisonment within the downgraded sentencing range because the presumption of imprisonment is determined "not by the sentence imposed[,] but by the offense for which a defendant is convicted," State v. O'Connor, 105 N.J. 399, 404-05 (1987).
>
> [Ibid.]

This jury convicted defendant of two second-degree crimes. The Legislature determined that both were subject to the sentencing range of five-to-ten years' imprisonment, N.J.S.A. 2C:43-6(a), and the presumption of imprisonment, N.J.S.A. 2C:44-1(d). Additionally, the Legislature required the sentences be served consecutively, N.J.S.A. 2C:21-27(c), thus conveying its

29

determination that the nature of the crimes warranted a particular need for deterrence. See Megargel, 143 N.J. at 501-02.

Based on these legislative determinations, the most lenient sentence the court could have imposed under a typical application of the laws was consecutive terms of five years' imprisonment, absent a downgrade and reduction in term of years, for an aggregate of ten years' imprisonment. However, the judge imposed an aggregate term of two years' probation subject to sixty days in county jail.[7]

The judge not only found that the mitigating factors preponderated, he also found that the presumption of imprisonment had been overcome. Most of the reasons he cited in support of the mitigating factors, however, were not supported by the record or were based on inappropriate considerations. Neither the downgrade nor the non-custodial term met the applicable standards.

The judge not only denigrated legislatively created offenses, equating them to terrible accounting practices, he disparaged the jury's verdict, stressing the purportedly slim line between criminal and civil matters. As we have previously said, a judge may not disregard the jury's findings, as expressed in

---

[7] The court also imposed a $250,000 fine, which the State does not challenge.

A-3781-18T4

their verdict.  See State v. Paden-Battle, 464 N.J. Super. 125, 150 (App. Div. 2020), certif. granted on other grounds, ___ N.J. ___ (2020).

The judge did not act in conformity with his duty to engage in good faith analysis of the statutory aggravating and mitigating factors in relation to the crimes the jury found.  Instead, he "exceeded [his] judicial prerogative" by substituting the legislative intent and the jury's decision with his own opinion regarding defendant's conduct.  Evers, 175 N.J. at 399.

The judge found mitigating factor two, N.J.S.A. 2C:44-1(b)(2) (defendant did not contemplate that his conduct would cause or threaten serious harm), reasoning that defendant had never intended to deprive the students their education; the children had not been denied anything; defendant had used the money for debt reduction; and defendant had believed that his use of the money benefited the children and school.  None of these reasons justify a finding of factor two.

Mitigating factor two relates "to the seriousness of the offense rather than the background and character of the offender[.]"  State v. Cullen, 351 N.J. Super. 505, 511 (App. Div. 2002) (holding that despite the defendant's "extensive" prior record, mitigating factor two applied to his drug possession conviction because he possessed "a single baggie containing .33 grams of cocaine" and his crime

had neither caused nor threatened serious harm). Factor two requires more than just a defendant's perception, otherwise every defendant who lacks remorse, feels justified, minimizes his conduct and believes that his conduct did not cause or threaten serious harm, would be entitled to have the factor included in the sentencing equation. See State v. Locane, 454 N.J. Super. 98, 127-28 (App. Div. 2018). Defendant's personal belief, if such it was, that he was not harming and was actually benefiting the students was thus irrelevant to mitigating factor two.

Moreover, defendant's personal belief cannot usurp the jury's verdict and serve as a reason to place him above the Legislature's determination that money laundering is a serious offense. Money laundering is defined as "engag[ing] in a transaction involving property known or which a reasonable person would believe to be derived from criminal activity . . . with the intent to facilitate or promote the criminal activity." N.J.S.A. 2C:21-25.

In explaining the purpose of the money laundering statute, the Legislature has said:

> It is in the public interest to make such conduct subject to strict criminal and civil penalties because of a need to deter individuals and business entities from assisting in the "legitimizing" of proceeds of illegal activity. To allow individuals or business entities to avoid responsibility for their criminal assistance in money laundering is clearly inimical to the public good.

A-3781-18T4

[N.J.S.A. 2C:21-23(e).]

Misconduct by a corporate official is defined as "purposely or knowingly us[ing], control[ling] or operat[ing] a corporation for the furtherance or promotion of any criminal object." N.J.S.A. 2C:21-9(c).

The jury's conviction signified a determination that defendant knew his conduct was unlawful. Despite this, the judge said that he was not personally convinced that there was a clear link between the debt defendant owed the school and his procurement of a fictitious credit. But the judge's personal opinion of the circumstances had no relevance in sentencing and served to render the harm caused by defendant's abuse of his position of trust nearly meaningless. See Paden-Battle, 464 N.J. Super. at 150; see also State v. Tindell, 417 N.J. Super. 530, 568 (App. Div. 2011) (explaining that a sentence must be based on the Code and not on "the judge's perception that the jury rendered an unjust verdict"). Additionally, the finding that defendant did not contemplate that his conduct would cause or threaten serious harm is in sharp contrast with the efforts he engaged in to hide the transfer of funds.

The judge found mitigating factor four, N.J.S.A. 2C:44-1(b)(4) (substantial grounds tended to excuse or justify defendant's conduct) because there was "clearly confusion" regarding the DOE regulations, especially in

relation to loans, and defendant's crimes were not discovered by the DOE, but rather by the Attorney General's Office years later. The judge thus afforded this factor "significant weight."

Mitigating factor four is generally found when the defendant has a particular condition that tends to excuse or justify his or her conduct. See State v. Jarbath, 114 N.J. 394, 414-15 (1989) (finding mitigating factor four based on severe psychiatric and cognitive impairment, which rendered the defendant unable to comprehend the wrongfulness of her conduct); State v. Briggs, 349 N.J. Super. 496, 504 (App. Div. 2002) (explaining that a history of continuous physical, sexual, and psychological abuse perpetrated by the victim against the defendant may form a basis for mitigating factor four); State v. Nataluk, 316 N.J. Super. 336, 349 (App. Div. 1998) (holding that the defendant's mental condition could establish mitigating factor four, even though the jury rejected the insanity defense). Here, defendant had no personal circumstance that explained his criminal conduct.

The DOE regulations were not implicated in the convictions, and the agency's failure to detect defendant's impropriety should not have benefitted him. That seems self-evident. That defendant's criminal actions went undiscovered for years until the matter was referred to the Attorney General's

Office should have no mitigating effect. Financial crimes are rarely uncovered immediately even where regular audits occur, and persons engaged in financial misdeeds go to great lengths to avoid discovery. Success in hiding wrongdoing does not constitute a mitigating factor.

The judge found mitigating factor six, N.J.S.A. 2C:44-1(b)(6) (defendant compensated the victim or will participate in community service) because there was "no evidence presented of an aggrieved victim." He gave this factor "little weight."

We do not understand the judge's rationale for this factor at all. Mitigating factor six applies only when a defendant pays restitution or participates in community service, neither of which the judge ordered. See Locane, 454 N.J. Super. at 128. Presumably, the judge reasoned that because defendant had returned the money and his community supported him, he had compensated the victim. Such a finding disregards both the statutory language and the fact that defendant's crimes were complete upon transfer of the funds and the Legislature has identified the victim of such crimes as the "public good." See N.J.S.A. 2C:21-23(e).

A-3781-18T4

The judge found mitigating factor seven, N.J.S.A. 2C:44-1(b)(7) (no criminal history). That finding is supported by the record, as defendant has no prior criminal history.

The judge found mitigating factor eight, N.J.S.A. 2C:44-1(b)(8) (defendant's conduct was the result of circumstances unlikely to recur) based on defendant's age and because "institutional controls have been implemented" to guard against similar conduct in the future, and defendant had "an impeccable reputation with handling school expenses." The judge added that the conviction resulted from "horrible bookkeeping" and that "there's a fine line sometimes between civil wrongs and criminal wrongs, and arguments could be made either way in this case." The judge noted that he would have afforded factor eight greater weight if defendant had admitted guilt, but he had not done so.

Mitigating factor eight applies when a defendant accepts responsibility and shows a willingness to remove himself or herself from circumstances that may lead to similar unlawful conduct. State v. Rice, 425 N.J. Super. 375, 382-83 (App. Div. 2012) (finding mitigating factor eight where the defendant had been convicted of official misconduct and agreed to forfeit his job as a police officer, thus foregoing the possibility of committing a similar crime). Defendant's continued denial of responsibility does not support a finding that

the circumstances are unlikely to recur, but rather, negates it. Moreover, the judge's assertion that the crimes were the result of "horrible bookkeeping" is inconsistent with the jury's verdict that defendant acted knowingly to further a criminal objective.

The judge found mitigating factor ten, N.J.S.A. 2C:44-1(b)(10) (defendant is particularly likely to respond to probation) because there was "no doubt" in the judge's mind that defendant would not reoffend. Factor ten is inapplicable when the conviction carries a presumption of imprisonment without a finding of "serious injustice." State v. Sene, 443 N.J. Super. 134, 144-45 (App. Div. 2015) (quoting Evers, 175 N.J. at 388).

The JOC also lists mitigating factor nine, N.J.S.A. 2C:44-1(b)(9) (defendant's character and attitude indicate an unlikelihood of reoffending). The court did not mention this factor at the sentencing hearing.

The judge found mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11) (imprisonment would entail excessive hardship to defendant's dependents) based on the care defendant provides to his disabled son. The evidence in the record supported this factor.

With respect to the aggravating factors, the judge found factors four, N.J.S.A. 2C:44-1(a)(4) (defendant violated public trust) based solely on the

definition of the crimes and factor nine, N.J.S.A. 2C:44-1(a)(9) (need to deter) based only on the general need to deter others. Again, the judge opined that the State's evidence was "slim" and that the matter "arguably could have been equally and responsibly handled as an administrative matter. The money taken was returned. Clearly, private money was used. And the crux of the State's case was about public money being used."

The judge rejected the State's argument that aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (risk of reoffending) and eleven, N.J.S.A. 2C:44-1(a)(11) (imposition of a fine, penalty or restitution would be perceived as a "cost of doing business") also applied.

The judge's decision to accord factor four (defendant violated public trust) little weight, based only on the definition of the crimes, is also inconsistent with the jury's findings. The distinction between private and public funds was irrelevant to the crimes of which defendant was convicted. The judge's assessment of the evidence and opinion that this matter could have been handled administratively were also inconsistent with the verdict and the legislative scheme.

The judge's finding that only a general need to deter existed does not fit the facts. It seems clear that a need to deter a particular defendant should exist

when that defendant refuses to admit guilt or show remorse, particularly when his crimes are second-degree and subject to enhanced sentencing (i.e., consecutive terms). See State v. Carey, 168 N.J. 413, 426 (2001) ("The need for public safety and deterrence increase proportionally with the degree of the offense."); State v. Rivers, 252 N.J. Super. 142, 153-54 (App. Div. 1991) ("Defendant's consistent denial of involvement and his lack of remorse indicate that a prison sentence is necessary to deter defendant from similar conduct in the future").

With respect to aggravating factor eleven, it applies when the crime does not carry a presumption of imprisonment or when the defendant argues that the presumption of imprisonment has been overcome. Dalziel, 182 N.J. at 502. Given defendant's refusal to acknowledge his wrongdoing, we agree with the State that an excessively lenient sentence may be deemed a cost of doing business that fails to impress upon defendant the severity of his crimes. See id. at 503.

On balance, the sentencing judge found that the "overwhelming" mitigating factors "greatly exceed[ed]" the two aggravating factors. Clearly, the judge muddled the standards for a downgrade and the presumption of imprisonment together, analyzing the issues based on his personal opinion of

defendant's actions and character, unfettered by the record or the law. The judge said that the nature of defendant's crimes were not as serious as other second-degree offenses because defendant returned the money, the community and Foundation supported him, and defendant used private--not public--money in the transfer. The judge also said that the main purpose of the two statutes was to "fight organized crime" and "drug offenders," and neither of those purposes applied to this case.

The judge considered defendant to be "particularly unique" because his skills enabled him to communicate with special needs children; he "filled a void" that public education could not fill; he was a leader in his community; his community overwhelmingly supported him; and his faith--not imprisonment--would determine his conduct. The judge said that a term of imprisonment would have no deterrent effect on defendant and would have insignificant general deterrence because "deterrents [sic] is really directed to those working in education, and where presumably then, the socioeconomic standards of that workforce is much higher than those who regularly appear in this Court for any type of drug offenses, or assaultive behavior." Further, the judge opined that those who work with special needs children do so "selflessly" and are "less likely to commit a financial crime for the typical motivation of greed." These

40

comments were puzzling not only because nothing in the record supported the judge's purely subjective generalizations—but because defendant seemingly fit the description of those the judge did not think needed to be deterred—"selfless" persons. Yet defendant was convicted of crimes involving $200,000.

The judge recognized that the Legislature had elevated the need for deterrence and the severity of the crimes by requiring the sentences be served consecutively but believed that this requirement "completely frustrate[d]" the downgrade provision. He found the minimum aggregate downgraded term of six years' imprisonment "entirely excessive" and said that it "actually would shock the [c]ourt's conscience if it had to impose" that term. The judge insisted that he was not replacing the legislative scheme with his own, but rather had established the basis for applying the serious injustice standard.

The judge then imposed the aggregate two-year probationary term conditioned upon sixty days' imprisonment in county jail and made "clear" for the record that he believed the DOE should allow defendant to "continue to perform all . . . responsibilities" that he "typically perform[ed] as an executive director[.]" The judge told the prosecutor that while the State had requested an "extended period of incarceration," he hoped "on further reflection, you'll find that my sentence, there is some wisdom to it[.]"

As the Court explained in State v. Megargel, a judge must find "compelling reasons" to downgrade a crime carrying an enhanced penalty. Megargel, 143 N.J. at 502. Those reasons must be "in addition to, and separate from" the preponderating mitigating factors. Ibid. As we explained in State v. Lake, "the severity of the crime remains the single most important factor[,]" "[a]lthough the surrounding circumstances and the need for deterrence may be taken into account." Lake, 408 N.J. Super. at 326. Focus must remain on the offense, not the offender, because "the principles underlying the Criminal Code favor deterrence and protection of the public over rehabilitation and are designed to foster uniformity in sentencing[.]" Ibid. "If the surrounding circumstances of an offense make it very similar to a lower degree offense, a downgraded sentence may be appropriate." Ibid.

In this case, defendant's crimes were not similar to third-degree offenses. The Code grades money laundering and misconduct by a corporate officer based on the amount transferred or obtained. N.J.S.A. 2C:21-9; N.J.S.A. 2C:21-27(a). Whether the defendant returned the money, used private funds, and had support from his community are irrelevant to the degree of either crime. The second-degree crime of money laundering involves an amount between $500,000 and $75,000 and a third-degree crime involves an amount less than $75,000.

N.J.S.A. 2C:21-27(a). The second-degree crime of misconduct by a corporate officer involves an amount of $75,000 or more, while a third-degree crime involves an amount between $1000 and $75,000. N.J.S.A. 2C:21-9(c). Defendant transferred $200,000, an amount squarely within the second-degree range for both crimes.

While the judge was correct that the purpose, at least in part, of the money laundering statute was to fight organized crime, particularly in relation to drug crimes, the judge erroneously portrayed this as the sole purpose. See N.J.S.A. 2C:21-23 (declaring the legislative purposes and findings). Another goal is to subject those who launder money to "strict criminal and civil penalties" to deter them from "legitimizing" illegal activity, which is "clearly inimical to the public good." N.J.S.A. 2C:21-23(e).

Further, the fact that defendant's crimes occurred in the context of a school for disabled children was irrelevant to the sentence, in general, and deterrence, in particular. The judge's comment regarding the perceived selflessness and socioeconomic status of individuals who work in special education institutions compared to those "who regularly appear" before that judge "for any type of drug offenses, or assaultive behavior" was not based on evidence in the record.

Moreover, in deciding whether to downgrade, "circumstances such as a defendant's overall character or contributions to the community should not be considered." Lake, 408 N.J. Super. at 328. "Characteristics or behavior of the offender are applicable only as they relate to the offense itself and give fuller context to the offense circumstances." Ibid. See also State v. L.V., 410 N.J. Super. 90, 112-13 (App. Div. 2009) (downgrading where the defendant's mental illnesses, young age, "very limited intelligence," cognitive inabilities, language and social barriers, years of having been sexually abused and threatened by her father, and having been twice impregnated by him explained why she had acquiesced to his orders to throw her newborn infant out a window).

With respect to the presumption of imprisonment applicable to both of defendant's crimes, the court erred in finding it had been overcome. The serious injustice standard is a higher standard than the standard for downgrading. Evers, 175 N.J. at 393. Unlike the downgrade standard, it considers "'the character and condition of the defendant' in determining whether imprisonment would be a 'serious injustice.'" Id. at 389 (quoting Roth, 95 N.J. at 358). The defendant's character and condition must be "truly extraordinary" so as to establish that the "'human cost' of punishing a particular defendant to deter others from committing his [or her] offense would be 'too great.'" Ibid. (quoting State v.

44

Rivera, 124 N.J. 122, 125 (1991)).  "Generally, for first- and second-degree crimes there will be an overwhelming presumption that deterrence will be of value."  Id. at 395.  Thus, only where the defendant is so unique and the gravity of his or her crime is so decreased by his or her uniqueness so as to significantly lessen the value of deterrence should a court find the serious injustice standard met.  Ibid.

Only two published decisions have found this standard satisfied.  The first of those cases is State v. Jarbath, where the Court affirmed the noncustodial sentence imposed on a psychotic woman with severe intellectual disabilities who had accidentally killed her infant by dropping him.  114 N.J. at 398.  The Court found that because she suffered from extreme mental illness and decreased mental functioning, the need for individual deterrence was essentially nonexistent, the need for general deterrence was limited by her unique situation, and imprisonment would impose unusual hardship and suffering upon her.  Id. at 405-06, 409.  In the second case, State v. E.R., we affirmed a resentencing to five years of probation and house arrest for two second-degree crimes based on a terminal illness that would soon take the defendant's life.  273 N.J. Super. 262, 273-74 (1994).  Both cases illustrate the extreme nature of the defendant's circumstances and the nearly nonexistent need for general deterrence based on

45

the defendant's unique characteristics that must exist to meet the "heavy burden" imposed by the serious injustice standard.  Evers, 175 N.J. at 392.

Numerous decisions have found the standard not satisfied.  See Trinidad, 241 N.J. at 457 (holding that a defendant who had served as a police officer for "substantial portions of his adult life" did not overcome the presumption of imprisonment simply because he had dedicated his life to public service and had provided financial support to family members); Evers, 175 N.J. at 400 (explaining that in setting the length of imprisonment, the "[d]efendant's status as a first-time offender, 'family man', 'breadwinner,' and esteemed member of the community, however commendable and worthy of consideration" was "not so extraordinary as to" overcome the presumption of imprisonment); Jabbour, 118 N.J. at 3-4, 8-9 (rejecting the notion that a first-time offender's likely rehabilitation based on intense counseling established a basis to overcome the presumption); State v. Johnson, 118 N.J. 10, 14-20 (1990) (finding that the first-time offender who pleaded guilty to sexually assaulting his step-daughter had not overcome the presumption by citing his deafness, drug dependency and contributions as the sole economic support of the family); State v. Kelly, 97 N.J. 178, 188 (1984) (affirming a custodial sentence imposed on a battered woman convicted of reckless manslaughter after she had killed her abusive husband,

even though her children depended on her for support); <u>State v. Wilson</u>, 421 N.J. Super. 301, 311-12 (App. Div. 2011) (holding that a defendant's sentence to imprisonment for a second-degree drug-offense of cultivating marijuana was proper despite his diagnosis of multiple sclerosis); <u>Lebra</u>, 357 N.J. Super. at 511-12 (reversing a probationary term for a second-degree crime, finding no basis to overcome the presumption of imprisonment even though the defendant had a brain tumor).

In this case, defendant lacked the unique characteristics that might meet the serious injustice standard. Neither his contributions to the community and school, the support he received from his community, the care he provided his disabled son, his age, nor his alleged belief that he had done nothing wrong, formed a basis to overcome the presumption of imprisonment. The judge was not free to disregard the legislative scheme simply because he believed that defendant had done many good deeds in his lifetime and had intended no harm.

Additionally, the judge was not free to impose a probationary term based on his disagreement with the jury's verdict. <u>State v. Cooke</u>, 345 N.J. Super. 480, 489-90 (App. Div. 2001) ("Disagreement with a jury verdict cannot justify a probationary sentence for a second-degree crime under the serious injustice exception to the statutory presumption of incarceration."). "However harsh the

grading of [defendant's] offense[s] may appear, that was the intent of the Legislature." Evers, 175 N.J. at 400. There was no basis to disregard it.

Indeed, the judge's statement that a sentence imposed in accordance with the Code would "shock" his conscience confused his role as a sentencing judge with that of a reviewing court. We exercise the discretion to set aside a sentence "when the application of the facts to the law is such a clear error of judgment that it shocks the judicial conscience." Roth, 95 N.J. at 364. By asserting that he could not impose a prison sentence because it would shock his conscience, the trial judge borrowed language, if not the standard, available only to reviewing courts.

Finally, we underscore another impropriety in the sentence, which is set forth in the JOC. The judge wrote:

> As part of this [JOC] the Court recommends to any government agency that has oversight of the operations of [the school], that the defendant be permitted to resume all other responsibilities that he performed while acting as Executive Director of [the school], with the exception of the prohibited activities mentioned in condition #1.

A sentencing judge should not add to a JOC a recommendation to an unrelated institution as to how it should interact with a person convicted of two second-degree offenses, and the duties and responsibilities it should allow that

person to perform. A judge's authority is anchored in the Code. Nothing in the Code authorizes the language employed here. Nothing in the Code vests in judges the power to convey their personal opinion of a defendant in the weighty format of an order of the court, which is enforceable by contempt powers.

The State requests that we remand to a different judge for resentencing based on the original sentencing judge's clear bias and disagreement with the jury verdict. We grant the State's request because this judge's comments throughout the sentencing established that his disagreement with the verdict would inhibit him from imposing a sentence in accordance with the Code. Tindell, 417 N.J. Super. at 572 (remanding for resentencing before a different judge because "the trial judge's personal views as to the propriety of the jury's verdict irreparably tainted the sentence he imposed on defendant").

Affirmed, except vacated as to the sentence, and remanded for resentence before a different judge.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION